# UNITED STATES *v.* LANIER

No. 95–1717.   Argued January 7, 1997—Decided March 31, 1997

*Deputy Solicitor General Waxman* argued the cause for the United States. On the briefs were *Acting Solicitor General Dellinger, Assistant Attorney General Patrick, Deputy Solicitor General Bender, Paul R. Q. Wolfson, Jessica Dunsay Silver,* and *Thomas E. Chandler.*

*Alfred H. Knight,* by appointment of the Court, 519 U. S. 804, argued the cause and filed a brief for respondent.*

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *Marjorie Heins* and *Steven R. Shapiro;* for the NOW Legal Defense and Education Fund et al. by *Lynn Hecht Schafran* and *Martha F. Davis;* for the Southern Poverty Law Center et al. by *Mary-Christine Sungaila, Gregory R. Smith, J. Richard Cohen,* and *Brian Levin;* and for Vivian Forsythe-Archie et al. by *Catharine A. MacKinnon.*

JUSTICE SOUTER delivered the opinion of the Court.

Respondent David Lanier was convicted under 18 U. S. C. § 242 of criminally violating the constitutional rights of five women by assaulting them sexually while Lanier served as a state judge. The Sixth Circuit reversed his convictions on the ground that the constitutional right in issue had not previously been identified by this Court in a case with fundamentally similar facts. The question is whether this standard of notice is higher than the Constitution requires, and we hold that it is.

I

David Lanier was formerly the sole state Chancery Court judge for two rural counties in western Tennessee. The trial record, read most favorably to the jury's verdict, shows that from 1989 to 1991, while Lanier was in office, he sexually assaulted several women in his judicial chambers. The two most serious assaults were against a woman whose divorce proceedings had come before Lanier and whose daughter's custody remained subject to his jurisdiction. When the woman applied for a secretarial job at Lanier's courthouse, Lanier interviewed her and suggested that he might have to reexamine the daughter's custody. When the woman got up to leave, Lanier grabbed her, sexually assaulted her, and finally committed oral rape. A few weeks later, Lanier inveigled the woman into returning to the courthouse again to get information about another job opportunity, and again sexually assaulted and orally raped her. App. 44–67. On five other occasions Lanier sexually assaulted four other women: two of his secretaries, a Youth Services Officer of the juvenile court over which Lanier presided, and a local coordinator for a federal program who was in Lanier's chambers to discuss a matter affecting the same court. *Id.*, at 13–43, 67–109.

Ultimately, Lanier was charged with 11 violations of § 242, each count of the indictment alleging that, acting willfully and under color of Tennessee law, he had deprived the victim

of "rights and privileges which are secured and protected by the Constitution and the laws of the United States, namely the right not to be deprived of liberty without due process of law, including the right to be free from wilful sexual assault." *Id.*, at 5–12. Before trial, Lanier moved to dismiss the indictment on the ground that § 242 is void for vagueness. The District Court denied the motion.

The trial judge instructed the jury on the Government's burden to prove as an element of the offense that the defendant deprived the victim of rights secured or protected by the Constitution or laws of the United States:

> "Included in the liberty protected by the [Due Process Clause of the] Fourteenth Amendment is the concept of personal bodily integrity and the right to be free of unauthorized and unlawful physical abuse by state intrusion. Thus, this protected right of liberty provides that no person shall be subject to physical or bodily abuse without lawful justification by a state official acting or claiming to act under the color of the laws of any state of the United States when that official's conduct is so demeaning and harmful under all the circumstances as to shock one's consci[ence]. Freedom from such physical abuse includes the right to be free from certain sexually motivated physical assaults and coerced sexual battery. It is not, however, every unjustified touching or grabbing by a state official that constitutes a violation of a person's constitutional rights. The physical abuse must be of a serious substantial nature that involves physical force, mental coercion, bodily injury or emotional damage which is shocking to one's consci[ence]." *Id.*, at 186–187.

The jury returned verdicts of guilty on seven counts, and not guilty on three (one count having been dismissed at the close of the Government's evidence). It also found that the two oral rapes resulted in "bodily injury," for which Lanier was

subject to 10-year terms of imprisonment on each count, in addition to 1-year terms under the other five counts of conviction, see § 242. He was sentenced to consecutive maximum terms totaling 25 years.

A panel of the Court of Appeals for the Sixth Circuit affirmed the convictions and sentence, 33 F. 3d 639 (1994), but the full court vacated that decision and granted rehearing en banc, 43 F. 3d 1033 (1995). On rehearing, the court set aside Lanier's convictions for "lack of any notice to the public that this ambiguous criminal statute [i. e., § 242] includes simple or sexual assault crimes within its coverage." 73 F. 3d 1380, 1384 (1996). Invoking general canons for interpreting criminal statutes, as well as this Court's plurality opinion in *Screws* v. *United States*, 325 U. S. 91 (1945), the Sixth Circuit held that criminal liability may be imposed under § 242 only if the constitutional right said to have been violated is first identified in a decision of this Court (not any other federal, or state, court), and only when the right has been held to apply in "a factual situation fundamentally similar to the one at bar." 73 F. 3d, at 1393. The Court of Appeals regarded these combined requirements as "substantially higher than the 'clearly established' standard used to judge qualified immunity" in civil cases under Rev. Stat. § 1979, 42 U. S. C. § 1983. 73 F. 3d, at 1393. Finding no decision of this Court applying a right to be free from unjustified assault or invasions of bodily integrity in a situation "fundamentally similar" to those charged, the Sixth Circuit reversed the judgment of conviction with instructions to dismiss the indictment. Two judges would not have dismissed the felony counts charging the oral rapes but concurred in dismissing the misdemeanor counts, while three members of the court dissented as to all dismissals.

We granted certiorari to review the standard for determining whether particular conduct falls within the range of criminal liability under § 242. 518 U. S. 1004 (1996). We now vacate and remand.

## II

Section 242 is a Reconstruction Era civil rights statute making it criminal to act (1) "willfully" and (2) under color of law (3) to deprive a person of rights protected by the Constitution or laws of the United States.[1]  18 U. S. C. § 242; *Screws* v. *United States, supra.*  The en banc decision of the Sixth Circuit dealt only with the last of these elements, and it is with that element alone that we are concerned here.[2]

The general language of § 242,[3] referring to "the deprivation of any rights, privileges, or immunities secured or pro-

---

[1] The present § 242 has its roots in portions of three Reconstruction Era Civil Rights Acts, whose substantive criminal provisions were consolidated in a single section in 1874.  See 2 Cong. Rec. 827–828 (1874) (describing derivation of consolidated criminal civil rights law from §§ 1 and 2 of the Civil Rights Act of 1866, 14 Stat. 27; §§ 16 and 17 of the Civil Rights Act of 1870, 16 Stat. 144; and § 1 of the Civil Rights Act of 1871, 17 Stat. 13).  Although those statutory forebears created criminal sanctions only for violations of some enumerated rights and privileges, the consolidated statute of 1874 expanded the law's scope to apply to deprivations of all constitutional rights, despite the "customary stout assertions of the codifiers that they had merely clarified and reorganized without changing substance."  *United States* v. *Price,* 383 U. S. 787, 803 (1966).  Since the 1874 recodification, Congress has revisited § 242 on several occasions, without contracting its substantive scope.  See 35 Stat. 1092 (1909) (adding willfulness requirement); 82 Stat. 75 (1968) (enhancing penalties for some violations); 102 Stat. 4396 (1988) (same); 108 Stat. 1970, 2109, 2113, 2147 (1994) (same).

[2] Thus, we do not address the argument, pressed by respondent, that the actions for which he was convicted were not taken under color of law. The Sixth Circuit discussed that issue only in the original panel opinion, subsequently vacated, but did not reach the question in the en banc decision under review here.  To the extent the issue remains open, we leave its consideration in the first instance to the Court of Appeals on remand.

[3] "Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens," shall be subject to specified criminal penalties.

tected by the Constitution or laws of the United States," is matched by the breadth of its companion conspiracy statute, § 241,[4] which speaks of conspiracies to prevent "the free exercise or enjoyment of any right or privilege secured to [any person] by the Constitution or laws of the United States." Thus, in lieu of describing the specific conduct it forbids, each statute's general terms incorporate constitutional law by reference, see *United States* v. *Kozminski*, 487 U. S. 931, 941 (1988); *United States* v. *Price*, 383 U. S. 787, 797, 805 (1966), and many of the incorporated constitutional guarantees are, of course, themselves stated with some catholicity of phrasing. The result is that neither the statutes nor a good many of their constitutional referents delineate the range of forbidden conduct with particularity.

The right to due process enforced by § 242 and said to have been violated by Lanier presents a case in point, with the irony that a prosecution to enforce one application of its spacious protection of liberty can threaten the accused with deprivation of another: what Justice Holmes spoke of as "fair warning . . . in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." *McBoyle* v. *United States*, 283 U. S. 25, 27 (1931). "'The . . . principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" *Bouie* v. *City of Columbia*, 378 U. S. 347, 351 (1964) (quoting *United States* v. *Harriss*, 347 U. S. 612, 617 (1954)).[5]

---

[4] Insofar as pertinent: "If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same," they shall be subject to specified criminal penalties.

[5] The fair warning requirement also reflects the deference due to the legislature, which possesses the power to define crimes and their punishment. See *United States* v. *Wiltberger*, 5 Wheat. 76, 95 (1820); *United*

There are three related manifestations of the fair warning requirement. First, the vagueness doctrine bars enforcement of "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally* v. *General Constr. Co.*, 269 U. S. 385, 391 (1926); accord, *Kolender* v. *Lawson*, 461 U. S. 352, 357 (1983); *Lanzetta* v. *New Jersey*, 306 U. S. 451, 453 (1939). Second, as a sort of "junior version of the vagueness doctrine," H. Packer, The Limits of the Criminal Sanction 95 (1968), the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. See, *e. g.*, *Liparota* v. *United States*, 471 U. S. 419, 427 (1985); *United States* v. *Bass*, 404 U. S. 336, 347–348 (1971); *McBoyle, supra*, at 27. Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, see, *e. g.*, *Bouie, supra*, at 357–359; *Kolender, supra*, at 355–356; *Lanzetta, supra*, at 455–457; Jeffries, Legality, Vagueness, and the Construction of Penal Statutes, 71 Va. L. Rev. 189, 207 (1985), due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope, see, *e. g.*, *Marks* v. *United States*, 430 U. S. 188, 191–192 (1977); *Rabe* v. *Washington*, 405 U. S. 313 (1972) *(per curiam); Bouie, supra*, at 353–354; cf. U. S. Const., Art. I, § 9, cl. 3; *id.*, § 10, cl. 1; *Bouie, supra*, at 353–354 *(Ex Post Facto*

States v. Aguilar, 515 U. S. 593, 600 (1995). See generally H. Packer, The Limits of the Criminal Sanction 79–96 (1968) (discussing "principle of legality," "that conduct may not be treated as criminal unless it has been so defined by [a competent] authority . . . before it has taken place," as implementing separation of powers, providing notice, and preventing abuses of official discretion) (quotation at 80); Jeffries, Legality, Vagueness, and the Construction of Penal Statutes, 71 Va. L. Rev. 189 (1985).

Clauses bar legislatures from making substantive criminal offenses retroactive). In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.

We applied this standard in *Screws* v. *United States*, 325 U. S. 91 (1945), which recognized that the expansive language of due process that provides a basis for judicial review is, when incorporated by reference into § 242, generally ill suited to the far different task of giving fair warning about the scope of criminal liability. The *Screws* plurality identified the affront to the warning requirement posed by employing § 242 to place "the accused . . . on trial for an offense, the nature of which the statute does not define and hence of which it gives no warning." *Id.*, at 101. At the same time, the same Justices recognized that this constitutional difficulty does not arise when the accused is charged with violating a "right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them." *Id.*, at 104. When broad constitutional requirements have been "made specific" by the text or settled interpretations, willful violators "certainly are in no position to say that they had no adequate advance notice that they would be visited with punishment. . . . [T]hey are not punished for violating an unknowable something." *Id.*, at 105. Accordingly, *Screws* limited the statute's coverage to rights fairly warned of, having been "made specific" by the time of the charged conduct. See also *Kozminski, supra,* at 941 (parallel construction of § 241).[6]

---

[6] This process of "making specific" does not, as the Sixth Circuit believed, qualify *Screws* as "the only Supreme Court case in our legal history in which a majority of the Court seems [to have been] willing to create a common law crime." 73 F. 3d 1380, 1391 (1996). Federal crimes are defined by Congress, not the courts, *Kozminski,* 487 U. S., at 939; *United States* v. *Wiltberger, supra,* at 95, and *Screws* did not "create a common

The Sixth Circuit, in this case, added two glosses to the made-specific standard of fair warning. In its view, a generally phrased constitutional right has been made specific within the meaning of *Screws* only if a prior decision of this Court has declared the right, and then only when this Court has applied its ruling in a case with facts "fundamentally similar" to the case being prosecuted. 73 F. 3d, at 1393. None of the considerations advanced in this case, however, persuade us that either a decision of this Court or the extreme level of factual specificity envisioned by the Court of Appeals is necessary in every instance to give fair warning.

First, contrary to the Court of Appeals, see *ibid.*, we think it unsound to read *Screws* as reasoning that only this Court's decisions could provide the required warning. Although the *Screws* plurality gave two examples involving decisions of the Court, their opinion referred in general terms to rights made specific by "decisions interpreting" the Constitution, see 325 U. S., at 104 (plurality opinion), and no subsequent case has held that the universe of relevant interpretive decisions is confined to our opinions. While *United States* v. *Kozminski*, 487 U. S. 931 (1988), a case under § 241 for violat-

law crime"; it narrowly construed a broadly worded Act of Congress, and the policies favoring strict construction of criminal statutes oblige us to carry out congressional intent as far as the Constitution will admit, see *Kozminski, supra,* at 939; *Huddleston* v. *United States,* 415 U. S. 814, 831 (1974); *United States* v. *Morris,* 14 Pet. 464, 475 (1840). Nor is § 242's pedigree as an Act of Congress tainted by its birth at the hands of codifiers who arguably made substantive changes in the pre-existing law, see n. 1, *supra,* as the Sixth Circuit concluded from the statutory history, 73 F. 3d, at 1384–1387. The legislative intent of Congress is to be derived from the language and structure of the statute itself, if possible, not from the assertions of codifiers directly at odds with clear statutory language. See, *e. g., United States* v. *Wells,* 519 U. S. 482, 496–497 (1997). Further, the Sixth Circuit's conclusion that Congress never intended § 242 to extend to "newly-created constitutional rights," 73 F. 3d, at 1387, is belied by the fact that Congress has increased the penalties for the section's violation several times since *Screws* was decided, without contracting its substantive scope, see n. 1, *supra.*

ing Thirteenth Amendment rights, did characterize our task as ascertaining the crime charged "by looking to the scope of the Thirteenth Amendment prohibition . . . specified in our prior decisions," *id.*, at 941, in at least one other case we have specifically referred to a decision of a Court of Appeals in defining the established scope of a constitutional right for purposes of § 241 liability, see *Anderson* v. *United States,* 417 U. S. 211, 223–227 (1974). It is also to the point, as we explain below, that in applying the rule of qualified immunity under 42 U. S. C. § 1983 and *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971), we have referred to decisions of the Courts of Appeals when enquiring whether a right was "clearly established." See *Mitchell* v. *Forsyth,* 472 U. S. 511, 533 (1985); *Davis* v. *Scherer,* 468 U. S. 183, 191–192 (1984); see also *id.*, at 203–205 (Brennan, J., concurring in part and dissenting in part); *Elder* v. *Holloway,* 510 U. S. 510, 516 (1994) (treating Court of Appeals decision as "relevant authority" that must be considered as part of qualified immunity enquiry). Although the Sixth Circuit was concerned, and rightly so, that disparate decisions in various Circuits might leave the law insufficiently certain even on a point widely considered, such a circumstance may be taken into account in deciding whether the warning is fair enough, without any need for a categorical rule that decisions of the Courts of Appeals and other courts are inadequate as a matter of law to provide it.

Nor have our decisions demanded precedents that applied the right at issue to a factual situation that is "fundamentally similar" at the level of specificity meant by the Sixth Circuit in using that phrase. To the contrary, we have upheld convictions under § 241 or § 242 despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights. See *United States* v. *Guest,* 383 U. S. 745, 759, n. 17 (1966) (prior cases established right of interstate travel,

but later case was the first to address the deprivation of this right by private persons); *United States* v. *Saylor*, 322 U. S. 385 (1944) (pre-*Screws;* prior cases established right to have legitimate vote counted, whereas later case involved dilution of legitimate votes through casting of fraudulent ballots); *United States* v. *Classic*, 313 U. S. 299, 321–324 (1941) (pre-*Screws;* prior cases established right to have vote counted in general election, whereas later case involved primary election); see also *Screws*, 325 U. S., at 106 (stating that *Classic* met the test being announced).

But even putting these examples aside, we think that the Sixth Circuit's "fundamentally similar" standard would lead trial judges to demand a degree of certainty at once unnecessarily high and likely to beget much wrangling. This danger flows from the Court of Appeals' stated view, 73 F. 3d, at 1393, that due process under § 242 demands more than the "clearly established" law required for a public officer to be held civilly liable for a constitutional violation under § 1983 or *Bivens*, see *Anderson* v. *Creighton*, 483 U. S. 635 (1987) (*Bivens* action); *Davis* v. *Scherer, supra* (§ 1983 action). This, we think, is error.

In the civil sphere, we have explained that qualified immunity seeks to ensure that defendants "reasonably can anticipate when their conduct may give rise to liability," *id.*, at 195, by attaching liability only if "[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right," *Anderson, supra*, at 640. So conceived, the object of the "clearly established" immunity standard is not different from that of "fair warning" as it relates to law "made specific" for the purpose of validly applying § 242. The fact that one has a civil and the other a criminal law role is of no significance; both serve the same objective, and in effect the qualified immunity test is simply the adaptation of the fair warning standard to give officials (and, ultimately, governments) the same protection from civil liability and its consequences

that individuals have traditionally possessed in the face of vague criminal statutes. To require something clearer than "clearly established" would, then, call for something beyond "fair warning."

This is not to say, of course, that the single warning standard points to a single level of specificity sufficient in every instance. In some circumstances, as when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary. See, e. g., *Mitchell* v. *Forsyth, supra,* at 530–535, and n. 12. But general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful," *Anderson, supra,* at 640. As Judge Daughtrey noted in her dissenting opinion in this case: " 'The easiest cases don't even arise. There has never been . . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability.' " 73 F. 3d, at 1410 (quoting *K. H. Through Murphy* v. *Morgan,* 914 F. 2d 846, 851 (CA7 1990)); see also *Colten* v. *Kentucky,* 407 U. S. 104, 110 (1972) (due process requirements are not "designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited"); *Williams* v. *United States,* 341 U. S. 97, 101 (1951) (holding that beating to obtain a confession plainly violates § 242). In sum, as with civil liability under § 1983 or *Bivens,* all that can usefully be said about criminal liability under § 242 is that it may be imposed for deprivation of a constitutional right if, but only if, "in the light of pre-existing law the un-

lawfulness [under the Constitution is] apparent," *Anderson, supra,* at 640. Where it is, the constitutional requirement of fair warning is satisfied.

Because the Court of Appeals used the wrong gauge in deciding whether prior judicial decisions gave fair warning that respondent's actions violated constitutional rights, we vacate the judgment and remand the case for application of the proper standard.[7]

*It is so ordered.*

---

[7] We also leave consideration of other issues that may remain open to the Court of Appeals on remand. Several of the arguments tendered by respondent here are, however, plainly without merit and need not be left open. First, Lanier's contention that *Screws* excluded rights protected by the Due Process Clause of the Fourteenth Amendment from the ambit of § 242 is contradicted by the language of *Screws* itself as well as later cases. See *Screws* v. *United States,* 325 U. S. 91, 100, 106 (1945); *United States* v. *Price,* 383 U. S., at 789, and n. 2, 793 (§ 242 is enforcement legislation enacted under § 5 of the Fourteenth Amendment and encompasses violations of rights guaranteed under the Due Process Clause). Second, although *DeShaney* v. *Winnebago County Dept. of Social Servs.,* 489 U. S. 189 (1989), generally limits the constitutional duty of officials to protect against assault by private parties to cases where the victim is in custody, *DeShaney* does not hold, as respondent maintains, that there is no constitutional right to be free from assault committed by state officials themselves outside of a custodial setting. Third, contrary to respondent's claim, *Graham* v. *Connor,* 490 U. S. 386, 394 (1989), does not hold that all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments; rather, *Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.