

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-17-2003

# USA v. Pritchard

Precedential or Non-Precedential: Precedential

Docket No. 02-2544

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"USA v. Pritchard" (2003). *2003 Decisions*. Paper 161.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/161

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed October 17, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-2544

UNITED STATES OF AMERICA

v.

RUSS PRITCHARD, JR.,
Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Criminal No. 01-cr-00147-03
(Honorable Petrese B. Tucker)

Argued June 16, 2003

Before: SCIRICA, *Chief Judge*, NYGAARD and
BECKER, *Circuit Judges*

(Filed: October 17, 2003)

THOMAS A. BERGSTROM, ESQUIRE
 (ARGUED)
138 Davis Road
Malvern, Pennsylvania 19355

Attorney for Appellant

ROBERT E. GOLDMAN, ESQUIRE
 (ARGUED)
Office of United States Attorney
504 West Hamilton Street
Allentown, Pennsylvania 18101

Attorney for Appellee

## OPINION OF THE COURT

SCIRICA, *Chief Judge.*

Defendant Russ Pritchard, Jr. was convicted of theft from a museum for his involvement in the misappropriation of a Civil War officer's uniform in violation of 18 U.S.C. § 668 (1994). At issue is whether the Hunt-Phelan Home Foundation, from whose care the uniform was taken, was a "museum" for purposes of the statute.[1]

## I.

The Hunt-Phelan Home enjoys a colorful history of regional and national significance. Located on historic Beale Street in Memphis, Tennessee, the Hunt-Phelan Home was built between 1828 and 1832 by Ellis Moore Driver. The five-bedroom, 8,500 square foot antebellum mansion was designed in the federal style by Robert Mills, an architect well-known for his design of the Washington Monument, the U.S. Treasury Building, and parts of the White House. The Hunt-Phelan Home and its surrounding grounds contained many novel features for the time, including a gas plant for interior illumination, a hot air furnace, and the first swimming pool in Memphis. Bricks for its five-brick thick walls were pressed and dried in the front yard.

The house passed to Driver's daughter, who married William R. Hunt, a Lieutenant Colonel in the Confederate Army. When the Union army took control of Memphis,

---

1. We exercise jurisdiction over a final decision of a district court under 28 U.S.C. § 1291. We review the sufficiency of the evidence "in the light most favorable to the government, and will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hodge*, 321 F.3d 429, 439 (3d Cir. 2003) (citing *United States v. Smith*, 294 F.3d 473, 478 (3d Cir. 2002)). We will exercise plenary review over issues of statutory interpretation. *Mitchell v. Horn*, 318 F.3d 523, 534 (3d Cir. 2003). A plenary standard also applies to our review of jury instructions where their interpretation turns on a matter of statutory construction. *United States v. Schneider*, 14 F.3d 876, 878 (3d Cir. 1994).

General Ulysses S. Grant established his headquarters in the house, and used its library as his personal office. The library's original inlaid parquet floors remain in excellent condition, in part because General Grant apparently required his soldiers to remove their boots before entering the room. After the war, the house returned to the control of the Hunt family, and later passed to their daughter, Julia Hunt, who married Colonel Phelan.

Over the years, the house remained an important residence and icon of antebellum architecture in Memphis, with prominent visitors including Confederate General Nathan Bedford Forrest, Confederate President Jefferson Davis and President Andrew Jackson. When many of the historic mansions on Beale Street were demolished as part of an urban renewal project, the Hunt-Phelan Home was saved from destruction by order of President Lyndon Johnson. It survives today as perhaps the last of the great mansions of Beale Street.

The Hunt-Phelan Home was passed to successive family members and was inherited—along with its contents—by William B. Day, Jr. in 1992. When Day inherited the house, it was "packed to the rafters" with historical items from generations of family members, many of which dated back to the Civil War and earlier. To make way for major renovations to the house, Day packed up its contents into fourteen forty-five foot trucks, and shipped the items to an offsite warehouse to be inventoried and cataloged.

Later that year, Day formed the Hunt-Phelan Home Foundation, a Tennessee non-profit corporation, to preserve the property and to operate it as a tourist attraction. The Foundation received funding from, among others, the City of Memphis and Federal Express, a Memphis corporation. Day placed the Hunt-Phelan Home under the Foundation. In 1995, the Foundation entered into an agreement with Elvis Presley Enterprises, the operator of Graceland, to operate and manage the home as a tourist attraction. The house was opened to the public on a regular basis in 1996 with paid and volunteer staff providing walking tours and facilitating special events, such as weddings. By that time, the house was fully restored to approximate its condition in 1858. Many of the items previously removed were placed on

display in the house, including several antebellum furniture pieces and thousands of books dating back as far as 1720. The remaining items—still owned by Day—were placed in a warehouse under the care and custody of the Foundation and Elvis Presley Enterprises.

In addition to other uses, the Foundation operated the Hunt-Phelan Home for educational purposes. Day and his sister, a teacher, joined with local school boards to develop a Civil War history curriculum and provided local teachers with a lesson plan for use during class trips to the home.

In 1996, Day contacted defendant Russ Pritchard, Jr. to assist him in evaluating and assessing several of the objects associated with the house. Pritchard, Jr. was the former curator of the Civil War Library and Museum in Philadelphia and a distant family member of Day. In the fall of 1996, Pritchard, Jr. traveled to Memphis to help determine which items should be exhibited in the house, with a special focus on Civil War-era military uniforms and objects. Pritchard, Jr. selected two Civil War uniforms, including Lieutenant Colonel Hunt's officer's frock coat and pants, to be taken back to Pennsylvania for authentication.

After a period of time during which Day heard nothing from Pritchard, Jr., Day contacted him about the items, including the Hunt uniform. Pritchard, Jr. informed Day that the Hunt uniform was only a costume, and that he had donated it to Goodwill. Day grew suspicious of this explanation after seeing what he thought was the Hunt uniform for sale on the internet, and caused a federal investigation to be initiated. The investigation revealed that Pritchard, Jr. and his son, Russ Pritchard, III, had taken the uniform to be authenticated by a textile expert before displaying it at the Gettysburg Civil War collectors show in 1997. In early 1998, Pritchard, III, sold the uniform to a collector in Georgia for $45,000. The collector then sold the Hunt uniform to another dealer for $51,800, who sold it to the State Museum of Tennessee for $67,500.

In May 2000, the Hunt-Phelan Home closed as a tourist attraction after the Elvis Presley Enterprises withdrew from its agreement to operate and manage the house.

On May 17, 2001, a federal grand jury returned twenty-two-count indictments against both Pritchard, Jr. and Pritchard, III. Pritchard, III, ultimately entered a guilty plea, while Pritchard, Jr. proceeded to trial. A jury found Pritchard, Jr. guilty of two counts, one for theft of an object of cultural heritage from a museum in violation of 18 U.S.C. § 668, and one for aiding and abetting. The District Court granted a motion for judgment of acquittal for the aiding and abetting count. Pritchard, Jr. appeals his conviction for theft from a museum.

## II.

### A.

Pritchard, Jr. was convicted by the jury of having stolen or obtained by fraud "from the care, custody, or control of a museum [an] object of cultural heritage." 18 U.S.C. § 668(b)(1). An "object of cultural heritage" is "an object that is: (A) over 100 years old and worth in excess of $5,000; or (B) worth at least $100,000." § 668(a)(2). There is no dispute that the Hunt uniform is an object of cultural heritage, or that Pritchard, Jr. stole or obtained the uniform by fraud. Rather, Pritchard, Jr. contends his conviction under 18 U.S.C. § 668 was contrary to law because the Hunt-Phelan Home Foundation does not meet the statutory definition of a "museum."

### B.

The statute defines a museum as:

> an organized and permanent institution, the activities of which affect interstate or foreign commerce, that—
>
> (A)  is situated in the United States;
>
> (B)  is established for an essentially educational or aesthetic purpose;
>
> (C)  has a professional staff; and
>
> (D)  owns, utilizes, and cares for tangible objects that are exhibited to the public on a regular schedule.

18 U.S.C. § 668(a)(1).

Pritchard, Jr. argues that the Hunt-Phelan Home Foundation is not a "museum" within the meaning of the statute. Pritchard, Jr. contends the fact the Foundation went out of business four years after it opened its doors suggests it was not a "permanent institution." We find this argument unconvincing. It is clear that the permanence requirement must be viewed as one of intent rather than as one of success. That a museum does not survive to trial cannot realistically be understood to deprive it of having been a museum during the time it was open. And, in this sense, the jury could properly conclude the Foundation was established to be a permanent institution.

The Oxford English Dictionary defines permanent as "continuing or designed to continue indefinitely without change." 2 Oxford English Dictionary 710 (compact edition 1987).[2] In accord with this definition, the statute's legislative history, albeit limited, suggests that its drafters meant to protect museums—both old and new—established with the intent to continue indefinitely. When proposing the amendment that would become the Theft From Museum statute, Senator Kennedy noted the growing art theft epidemic had forced museums "to undertake expensive measures to protect their treasures, and the burden is equally great on smaller and less established museums and galleries." 137 Cong. Rec. S9088 (June 28, 1991) (statement of Sen. Kennedy). At the time the Hunt uniform was stolen, the Hunt-Phelan Home Foundation was undoubtedly in its infancy. But the record contains powerful indicia of intent to establish the Foundation as a permanent institution—to wit, the Foundation filed a nonprofit corporate charter, assembled an advisory board of

---

2. Other dictionaries similarly define the term to include the concept of intent. *See, e.g.*, Random House Dictionary of English Language 1442 (2d ed. 1987) ("intended to exist or function for a long, indefinite period without regard to unforeseeable conditions"); Webster's Third New International Dictionary 1683 (1993) ("fixed, or intended to be fixed"); Webster's New World Dictionary of the American Language 1059 (2d ed. 1972) ("lasting or intended to last indefinitely without change"); 1 The New Century Dictionary 1285 (1942) ("[l]asting or intended to last indefinitely").

leading Memphis scholars, secured grants and donations from the City of Memphis, prominent local corporations and individual donors, contracted with Elvis Presley Enterprises to manage the house, and hired museum staff. While the Foundation only survived a few years, it had the characteristics of a permanent repository for works of historical and cultural significance.

With respect to the remaining elements of the statute, there is little question that the Foundation is situated in the United States or that the Foundation engaged in activities which affect interstate commerce.[3] Nor is there a real question that the jury was provided with sufficient evidence to find that the Foundation employed a professional staff to run the Hunt-Phelan Home and that the Foundation was established for an "essentially educational or aesthetic purpose."[4]

The crucial question, therefore, is whether the government met its burden of establishing that the Foundation "own[ed], utilize[d], and care[d] for tangible objects that are exhibited to the public on a regular schedule." 18 U.S.C. § 668(a)(1)(D). Congress drafted the definition of "museum" in the conjunctive, which requires that a museum satisfy each of three independent conditions: (1) ownership; (2) use; and (3) care of tangible objects. It is undisputed that the Hunt-Phelan Home Foundation owned, used and cared for the house, and that

3. Among other bases for this conclusion, the Hunt-Phelan Home was a tourist attraction that drew visitors from around the country. *See Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964) (holding regulation of motels serving interstate travelers acceptable regulation of interstate commerce).

4. Pritchard, Jr. contends the predominant activities of the Foundation were "commercial in nature" and indicate the museum was not established for "essentially educational or artistic purpose." At trial, the jury rejected the argument that the Foundation was essentially a commercial enterprise created by Day to benefit from the tax-exempt status of the nonprofit form. The record contains sufficient evidence for a rational trier of fact to conclude that the various weddings and parties hosted at the Hunt-Phelan Home merely provided a means to defray the costs of running the property, and did not compromise the essentially educational or artistic purpose of the Foundation.

the house was exhibited to the public on a regular basis. But there is nothing in the record that shows any of the objects displayed in the house were owned by the Foundation or anyone other than Day himself.

Most museums own some, if not most, of the objects within their collections. However, as the government suggests, requiring that a "museum" own all of the objects it displays would place many of the country's greatest art museums outside the protection of the statute.[5] For example, a strict ownership requirement would exclude "museums" created by individuals to house their private collections—like the Phillips Collection or the original Whitney Museum—at least as long as the collection remained in the hands of a private owner. Most would view these institutions as museums whether or not the donor families owned the objects displayed, or whether they had transferred title to the objects to an independent entity.

Indeed, it appears that Congress had this precise scenario in mind when it originally crafted § 668. What would become § 668 was originally introduced as an amendment to the Violent Crime Control Act in 1991 by Senator Edward Kennedy, together with Senator Orrin Hatch. 137 Cong. Rec. S9087 (June 28, 1991). The amendment was offered, at least in part, in response to the infamous multi-million dollar theft from the Isabella Stuart Gardner Museum in Boston.[6] When Senator Kennedy

---

5. The American Association of Museums has recognized the important role museums play not only in collecting and caring for objects of cultural significance, but also in displaying objects on loan from other institutions or individuals. "Since no single museum contains, or could contain, all objects of admiration and understanding, museums have traditionally exhibited not only objects from their own collections but also objects borrowed from other museums and from private individuals and organizations. Borrowing objects allows museums to provide more comprehensive exhibits and to make objects more accessible that would otherwise be seen by only a few." *See* American Association of Museums, *Guidelines on Exhibiting Borrowed Objects, at* http://www.aam-us.org (last visited Sept. 5, 2003).

6. The Isabella Stuart Gardner Museum art heist is as well-known as it is tragic. In the early hours of March 18, 1990, two unknown robbers

offered the amendment, he placed into the record several news accounts of the theft from the Gardner Museum. *Id.* at S9088-90. Congress enacted the amendment section in substantially similar form in 1994. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994). Isabella Stuart Gardner created the museum in 1903 to display her personal art collection, and operated the museum herself for a number of years. It would be surprising if the statute did not include independent institutions, like the Gardner Museum, founded by a single individual whose collections partially consist (or consisted) of that person's private collection.

On the other hand, the government's interpretation is in tension with the plain language of the statute, which requires that the institution itself own, utilize, and care for exhibited objects. And because this is a criminal statute, we would be reluctant to adopt an interpretation that was broader than the plain language suggests. "[T]he canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *United States v. Lanier*, 520 U.S. 259, 266 (1997).

The ownership requirement may serve important purposes. Congress may have wanted to distinguish "museums" from exhibition spaces or wholly personal collections in private homes. Whether or not a person opens his personal art collection to the public, a few paintings in a private living room surely do not constitute a "museum". When a person creates an independent institution to exhibit his own personal collection, a policymaker could conceivably think it better to treat an unlawful taking of exhibited objects as theft from the owner himself, and not from a museum. Drawing lines that define "museum" is a

---

dressed as Boston policemen entered the museum claiming they were responding to a call of disturbance. After duping the on-duty security guards, it took the thieves little more than an hour to remove thirteen irreplaceable works of art from Fenway Court, including Vermeer's *The Concert* (1658-1660), Rembrandt's *The Storm on the Sea of Galilee* (1633), and five works by Degas. The Gardner Museum robbery — the costliest art theft in United States history — remains unsolved.

difficult task. Requiring that the institution own some of the objects it displays is one way of differentiating a museum from other institutions which display objects of cultural heritage. It ensures that the institution independently possesses all of the features of a museum, whether or not some of the objects it exhibits are owned by other individuals or entities. Whether or not the statute's definition best captures our ordinary sense of what a museum is in all cases, this interpretation would seem to represent a reasonable attempt to delineate a class of institutions as museums—theft from which subjects defendants to federal criminal prosecution.

In any event, we find it unnecessary to resolve this difficult interpretive issue. While there is no evidence in the record that the Foundation owned any of the objects within the house, the Hunt-Phelan Home Foundation owned the house itself. And the house is clearly an object of great historical and aesthetic significance. Indeed, it was arguably the primary exhibit on the property. The significance of the Foundation, and the "cultural heritage" of the various objects and exhibits it displayed, are integrally tied to the Hunt-Phelan Home. Day collaborated with scholars, the City of Memphis, the Memphis Arts Council and private donors to create a Foundation that displayed "a portrait of life of a family through generations in the South." The canvas for this portrait is the Hunt-Phelan Home. The gas chandelier that hangs in the parlor would, of course, be an interesting bauble, entombed in a glass case and paired with a well-crafted informational placard. But how much more significant for the student of history to view that same lamp dangling from its original moorings in the ornate parlor ceiling and imagining how its incandescent glow might have illuminated the tapestry screens or the wax makeup of newly-arrived house guests. Likewise, the near-perfect parquet floor would hang nicely along a narrow and austere hallway, cut into discrete sections and perfectly positioned to allow passers-by to study the intricate details of its craftsmanship. But better still to walk to the transom of the library and hear General Grant barking at Union army lieutenants to deposit their leather boots outside the door before discussing troop arrangements for the Battle of Vicksburg. Demanding that

the Foundation own something more discrete than the house—a table, a chair, the Hunt uniform—ignores the obvious fact that the objects within the home draw much of their cultural and historical significance from their association with the house itself.

We believe that ownership of the house contributed to the Foundation's independent existence as a cultural, educational, and aesthetic institution. Because the Foundation owned, utilized and cared for the Hunt-Phelan Home and other historic structures on the property which it exhibited to the public on a regular schedule, the Hunt-Phelan Home Foundation is a "museum" within the meaning of the statute.

## III.

Because the Hunt-Phelan Home Foundation was a museum, the wrongful taking of an object under its "care, custody, or control" is theft from a museum, no matter who owns the object taken. The statute does not require the stolen object to be owned by the museum itself. One violates the statute by unlawfully taking an object of cultural heritage from the "care, custody, or control" of a museum, regardless of its actual owner. The taking of a Fra Angelico or a Leonardo on loan from another collection to the Philadelphia Museum of Art would clearly amount to theft from a museum. Stated differently, the ownership requirement applies to the definition of "museum," not to the stolen object. Once it is established that an institution is a museum, any object of cultural heritage stolen from the museum's "care, custody, or control" will give rise to criminal liability under § 668.

There is ample evidence in the record to support a finding that the Hunt uniform was under the care, custody, and control of the museum when misappropriated. Accordingly, we will affirm the judgment of conviction.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*