HOWARD L. MAXON, APPELLANT, V. CITY OF
GRAND ISLAND, NEBRASKA, APPELLEE.
731 N.W.2d 882

Filed May 25, 2007.    No. S-05-1204.

Vincent Valentino, of Angle, Murphy, Valentino & Campbell, P.C., for appellant.

William A. Harding and Adam J. Prochaska, of Harding, Shultz & Downs, and Douglas R. Walker, Grand Island City Attorney, for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

Gerrard, J.

## NATURE OF CASE

Howard L. Maxon, a former officer of the City of Grand Island, Nebraska, appeals from the order of the district court affirming the termination of his employment by the city. Pursuant to Grand Island city ordinance § 2-22, an officer of the city, such as Maxon, may be removed from office by the mayor for "misconduct." Because we conclude that the city's allegations against Maxon do not constitute misconduct, we reverse the judgment of the district court and remand the cause to the court with directions to provide relief in a manner that is not inconsistent with this opinion.

## STATEMENT OF FACTS

Maxon served as the emergency management director of the City of Grand Island and Hall County for approximately 25 years. As the emergency management director, Maxon was considered an appointive officer of the City of Grand Island.[1]

On February 15, 2005, Gary Greer, the Grand Island city administrator, asked Maxon to come to Greer's office, where Greer took Maxon's keys, asked him to sign a letter of resignation, and then asked him to leave. Maxon refused to sign the letter and ultimately left the building. Greer issued a letter to Maxon, dated February 15, 2005, informing him that he was being suspended with pay, effective immediately. The letter indicated that a copy of the letter would be sent to the mayor and that Greer was requesting that Maxon be discharged at the earliest possible time. The letter set forth specific instances in which Greer considered Maxon's conduct to have been unacceptable for a director of the City of Grand Island.

The following day, February 16, 2005, Maxon wrote a letter to the mayor requesting a hearing to appeal the notice of discharge and asking that he be permitted to continue working pending the outcome of the hearing. Maxon's request to continue working was denied.

On February 25, 2005, in compliance with § 2-22, the mayor signed and filed formal charges of misconduct against Maxon.

---

[1] Grand Island City Ordinance, ch. 2, art. II, § 2-21.

The alleged charges of misconduct were divided into four categories: (1) unsatisfactory performance; (2) incompetence; (3) demeaning, disruptive, and uncooperative conduct in the workplace; and (4) insubordination. Instances of each were specified in the charges.

The hearing before the city council was held on March 29, 2005. At the time of the hearing, the city chose to prosecute only three of the four charges of misconduct, removing the third category, "Demeaning, Disruptive and Uncooperative Conduct in the Work Place." During the course of the hearing, both the city and Maxon were allowed to submit evidence and examine witnesses.

### UNSATISFACTORY PERFORMANCE

In support of its contention that Maxon's job performance was unsatisfactory, the city offered into evidence two of Maxon's performance evaluations that Greer had conducted. The first evaluation occurred on April 27, 2004, and Greer concluded that Maxon had met or exceeded expectations in some areas but needed improvement in other areas, including dependability, productivity, initiative, attitude, self-improvement, leadership, and training.

Greer performed a second performance evaluation of Maxon on February 9, 2005. The results of this evaluation indicated that Maxon's job performance had not improved. The evaluation provided that Maxon still needed improvement in all of the same areas as in his April 2004 evaluation and also needed improvement in the areas of quality, versatility, communication skills, and delegation.

Maxon presented evidence that all his performance evaluations prior to the time Greer became the city administrator were satisfactory. On cross-examination, Greer admitted that his performance evaluations of Maxon were vastly different when compared to the evaluations of prior supervisors. Maxon testified that he was "shocked" when Greer informed him that his performance was unsatisfactory.

### INCOMPETENCE

With regard to the city's allegation that Maxon was incompetent, the city presented evidence that while Maxon was the

emergency management director, 911 emergency dispatch service surcharges increased from 50 cents per telephone landline to $1 per telephone landline, which should have resulted in an increase in revenue for Maxon's department. David Springer, the finance director for the City of Grand Island, testified that he asked Maxon multiple times if everything was "on track" for the surcharge to be increased starting on January 1, 2002, and that Maxon assured him that it was. However, Springer testified that Maxon failed to implement the surcharge increase for 2002 and that this resulted in a 1-year delay and cost the city an estimated $100,000 to $180,000 in lost revenue.

Maxon testified that he did everything he could to facilitate the 911 surcharge implementation process and that any delay was not his fault, but was the result of the county board's failure to act in a timely manner. Maxon presented evidence that at a July 11, 2000, county board meeting, he and a committee of the Hall County Board of Supervisors recommended increasing the 911 surcharge. The board, however, voted to table the recommendation. The record shows that the next time the county board discussed the increase concerning the 911 surcharge was on November 13, 2001.

The Hall County clerk testified that at this meeting, it was Maxon who brought to the board's attention the notice requirements to be complied with before implementing the surcharge increase. The county board met on December 18, 2001, and again discussed the 911 surcharge increase. The county clerk testified, however, that the board "took no action at that time with respect to the 911 surcharge." The resolution to increase the 911 surcharge was eventually adopted by the county board on July 16, 2002.

With respect to this 1-year delay, Maxon testified that "we thought everything was fine and then at the last minute we found out that the telephone companies . . . had to be notified." When asked about a September 2000 letter generically addressed from Qwest Communications, Inc., to "QWEST Enhanced 911 Customer," which provided information that such notice was required, Maxon testified that he did not recall receiving the letter, and his customary initials acknowledging receipt were not contained on the letter.

Greer also testified that he asked Maxon to configure the telephone system so that National Public Radio would play when a caller was placed on hold. Approximately 1 month after asking Maxon to perform this responsibility, the system had still not been configured. Shortly thereafter, Greer reassigned this responsibility to another department. Maxon testified that after receiving this assignment, he discovered a broken cable which he unsuccessfully attempted to repair. Maxon explained that he contacted a vendor, who then repaired the broken cable shortly before Greer reassigned the project.

## INSUBORDINATION

The city's remaining charge against Maxon involved allegations of insubordination. The city presented evidence that Greer interviewed every employee in Maxon's department and then created an interoffice memorandum, addressed to Maxon, that summarized the content of the interviews and made suggestions for correcting certain problems. Greer concluded the memorandum by stating, "I would encourage you to share this memo (post it on the wall) and discuss its contents with department team members." Greer testified that he expressly told Maxon to post this memorandum on the wall, but Maxon failed to do so.

Maxon testified that although he did not post the memorandum on the wall, he did share the memorandum with the department team leaders. In response to why he did not post the memorandum on the wall, Maxon explained that he and another official in his department felt that it "would not further the betterment of the department at that time." Maxon further testified that although the memorandum was not posted on the wall, it was eventually distributed to all of the employees.

The city council voted to affirm the charges of misconduct and the termination of Maxon's employment. Maxon filed a petition in error with the district court seeking review of the city council's determination. The district court affirmed the city council's decision. Maxon appealed.

## ASSIGNMENTS OF ERROR

Maxon assigns, restated and renumbered, that the district court erred in (1) finding that § 2-22 is not unconstitutionally

vague, (2) determining that there was sufficient evidence in the record to sustain the formal charges of misconduct against him and that he received proper notice of those charges, (3) failing to find that the city had violated his procedural due process rights, (4) finding that he received proper notice of the charges against him when the city adduced evidence outside of the formal charges, (5) finding that his failure to request a continuance at the hearing waived any procedural defects he may have had regarding the city's failure to formally appoint a special assistant city attorney to prosecute the charges against him, (6) concluding that the interlocal agreement between the city and Hall County allowed the city to unilaterally terminate him, and (7) failing to conclude that the city council was required to make findings of fact and conclusions of law relating to its determination to affirm the charges of misconduct against him.

## STANDARD OF REVIEW

■ The constitutionality of an ordinance presents a question of law, in which an appellate court is obligated to reach a conclusion independent of the decision reached by the trial court.[2]

■ In reviewing the decision of an administrative tribunal on a petition in error, both the district court and the appellate court review the decision of the tribunal to determine whether it acted within its jurisdiction and whether the decision of the tribunal is supported by sufficient relevant evidence.[3]

## ANALYSIS

### Unconstitutionality of § 2-22

■ We first consider Maxon's assertion that § 2-22 is unconstitutionally vague. When passing on the constitutionality of an ordinance, this court begins with a presumption of validity. Therefore, the burden of demonstrating the constitutional defect rests with the challenger.[4] The void-for-vagueness doctrine

---

[2] *Waste Connections of Neb. v. City of Lincoln*, 269 Neb. 855, 697 N.W.2d 256 (2005).

[3] *Barnett v. City of Scottsbluff*, 268 Neb. 555, 684 N.W.2d 553 (2004).

[4] *Howard v. City of Lincoln*, 243 Neb. 5, 497 N.W.2d 53 (1993).

requires that an ordinance define the prohibited conduct with sufficient definiteness such that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.[5]

Section 2-22 provides in relevant part that the mayor may remove an officer of the city "for misconduct" and establishes the procedure by which an officer may be terminated, including written charges and a hearing before the city council. Maxon argues that because the ordinance neither defines misconduct nor explains the type of behavior that would qualify as misconduct, it is unconstitutionally vague and violates the due process provisions of the U.S. Constitution and the Nebraska Constitution. Accordingly, we must determine whether the term "misconduct" as used in § 2-22 is unconstitutionally vague.

■ In the context of an employment case involving an employee's request for unemployment benefits, although the term "misconduct" was not defined in the applicable statute, we concluded that the definition of "misconduct" was well established. We explained:

"While the term 'misconduct' is not specifically defined in the statute, it has generally been defined to include behavior which evidences (1) wanton and willful disregard of the employer's interests, (2) deliberate violation of rules, (3) disregard of standards of behavior which the employer can rightfully expect from the employee, or (4) negligence which manifests culpability, wrongful intent, evil design, or intentional and substantial disregard of the employer's interests or of the employee's duties and obligations."[6]

While the facts of the present case involve an ordinance dealing with the removal of an employee, as opposed to an employee's ability to receive unemployment benefits, we do not

---

[5] *Village of Winslow v. Sheets*, 261 Neb. 203, 622 N.W.2d 595 (2001).

[6] *Poore v. City of Minden*, 237 Neb. 78, 80, 464 N.W.2d 791, 793 (1991) (quoting *Stuart v. Omaha Porkers*, 213 Neb. 838, 331 N.W.2d 544 (1983)). See, also, *Douglas Cty. Sch. Dist. 001 v. Dutcher*, 254 Neb. 317, 576 N.W.2d 469 (1998).

find this to be a relevant distinction. There is no logical reason why the generally accepted definition of misconduct in an employment setting should not likewise apply to § 2-22 in the present case.

■ For an ordinance to meet constitutional standards, it is not necessary that it define or describe every conceivable situation under which misconduct may be found. As we have noted in previous cases, when evaluating an ordinance for vagueness, we do not seek mathematical certainty, but, rather, flexibility and reasonable breadth.[7] Moreover, a statute will not be deemed vague if it uses ordinary terms which find adequate interpretation in common usage and understanding.[8]

We conclude that the term "misconduct," as used in the context of an employment relationship such as that found in § 2-22, has the same generally accepted meaning as in our prior cases dealing with unemployment benefits. Unlike some other settings where the term "misconduct" has been found to be unconstitutionally vague,[9] we find that the term, as used in an employment context, carries a common enough meaning to satisfy the requirements of due process and, therefore, is not unconstitutionally vague.

## ALLEGATIONS OF MISCONDUCT

Maxon next argues that the allegations of misconduct with which he has been charged, specifically, unsatisfactory performance, incompetence, and insubordination, do not constitute misconduct as required by § 2-22. We agree.

Pursuant to the generally accepted definition of "misconduct" previously discussed, in order for the city to remove Maxon, his alleged behavior must include conduct that would evidence wanton and willful disregard of the employer's interests, deliberate

---

[7] *Howard v. City of Lincoln, supra* note 4.

[8] *Hall v. Progress Pig, Inc.*, 259 Neb. 407, 610 N.W.2d 420 (2000).

[9] See, e.g., *Giaccio v. Pennsylvania*, 382 U.S. 399, 86 S. Ct. 518, 15 L. Ed. 2d 447 (1966) (statute allowing jury to assess costs against acquitted criminal defendant where it found defendant guilty of "misconduct"); *Soglin v. Kauffman*, 418 F.2d 163 (7th Cir. 1969) (university disciplinary proceeding).

violation of rules, disregard of standards of behavior which the employer can rightfully expect from the employee, or negligence which manifests culpability, wrongful intent, evil design, or intentional and substantial disregard of the employer's interests or of the employee's duties and obligations.[10]

The city's allegations of unsatisfactory performance, incompetence, and insubordination are not categories of job performance that are commonly understood to be "misconduct" in an official capacity. While we question whether conduct characterized as unsatisfactory performance or incompetence could ever qualify as misconduct, as that term is commonly understood, on the specific facts presented in this case, they certainly do not. We also recognize that under certain circumstances, insubordination may rise to the level of misconduct. Again, however, the fact that Maxon chose not to post Greer's memorandum on the wall does not satisfy that threshold.

In concluding that Maxon's conduct rises to the level of "misconduct" as required by § 2-22, the dissent relies on its understanding of one aspect of "misconduct," which is "negligence which manifests culpability," or, stated another way, "culpable negligence." The dissent asserts, relying on dictionary definitions of "negligence" and "culpability," that "negligence which manifests culpability," or "culpable negligence," is satisfied upon a mere showing of blame for ordinary negligence. But the same dictionary defines "culpable negligence" as conduct that "while not intentional, involves a disregard of the consequences likely to result from one's actions,"[11] and further explains that culpable negligence " 'means something more than negligence' " and " 'has been held to amount to more than "blameworthy" conduct . . . .' "[12]

This is consistent with the well-established principle that culpable negligence, as contemplated by § 2-22, requires a showing of conduct that rises above that which would generally qualify

---

[10] *Poore v. City of Minden, supra* note 6.

[11] Black's Law Dictionary 1062 (8th ed. 2004).

[12] *Id.* at 1062. Accord 65 C.J.S. *Negligence* § 19 (2000).

as ordinary or simple negligence.[13] Our view of "culpable negligence" fundamentally differs from the dissent's view. While difficult to precisely define, culpable negligence is more than simple negligence and less than an intentional act—but on a sliding scale, culpable negligence is much closer to an intentional disregard of the employer's interests than it is to mere negligence (i.e., neglect of duty). As explained by another court, "culpable negligence" consists of

> acts which are . . . unreasonable and taken in disregard of a known or obvious risk . . . . Thoughtless, heedless, or inadvertent acts do not constitute culpable negligence, nor do mere errors in judgment or simple inattention. Mistakes in judgment resulting from inexperience, excitement, confusion, or inattention likewise do not constitute culpable negligence.[14]

Thus, in order for the city to establish that Maxon's conduct constitutes "negligence which manifests culpability," the city must prove more than ordinary negligence in the performance of duty. Even viewing the evidence in a light most favorable to the city, which we must, the circumstances with regard to the 911 surcharge issue present, at most, a disputed case of ordinary negligence in the performance of duty which, as already discussed, is an insufficient ground for terminating Maxon *for misconduct* under § 2-22.

We note that Maxon is not an elective officer within the scope of Neb. Rev. Stat. § 16-217 (Reissue 1997), and there is nothing that would prevent a municipality from enacting an ordinance that would empower the city to terminate an employee, such as Maxon, for behavior such as incompetence, neglect of duty, insubordination, or even official misconduct, so long as the categories or definitions are sufficient to give persons of common

---

[13] See, *Favreau v. Dept. of Employment and Training*, 151 Vt. 170, 557 A.2d 909 (1989); *Bettencourt v. Pride Well Service, Inc.*, 735 P.2d 722 (Wyo. 1987); *Byers v. Ritz*, 890 So. 2d 343 (Fla. App. 2004); *Liberty Mortg. v. National City Bank*, 755 N.E.2d 639 (Ind. App. 2001); *Matter of Coniber v. Hults*, 15 A.D.2d 252, 222 N.Y.S.2d 773 (1962).

[14] *Martin v. Alley Const., Inc.*, 904 P.2d 828, 832 (Wyo. 1995).

intelligence adequate notice of the transgressing conduct.[15] However, § 2-22, as it currently reads, provides no such additional categories. Accordingly, the only behavior for which the city may remove Maxon from office is misconduct, and the city's evidence and allegations of unsatisfactory performance, incompetence, and insubordination do not rise to the level of misconduct as that term is generally understood.

We conclude that the allegations raised against Maxon do not rise to the level of misconduct as required by § 2-22. Because this conclusion is dispositive, we need not address Maxon's other assignments of error.

## CONCLUSION

For these reasons, we reverse the judgment of the district court with directions to reverse the decision of the city council and provide relief in a manner that is not inconsistent with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.

---

[15] See *United States v. Lanier,* 520 U.S. 259, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997).

CONNOLLY, J., dissenting.

I join the part of the majority opinion that holds that the term "misconduct" is not unconstitutionally vague. But I dissent because I believe Maxon's carelessness in handling the surcharge amounted to misconduct. The majority opinion concludes that the term "misconduct" in the context of an employment relationship includes "'negligence which manifests culpability'." This definition is well established within our unemployment benefits jurisprudence.

Negligence is commonly understood as the "failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation,"[1] and culpability means "[b]lameworthiness."[2] Thus, I interpret "negligence which

---

[1] Black's Law Dictionary 1061 (8th ed. 2004).

[2] *Id.* at 406.

manifests culpability" as an ordinary negligence standard with a showing of blameworthiness. The majority opinion, however, asserts that "negligence which manifests culpability" is equivalent to "culpable negligence," a term of art with a distinct legal definition. But in assuming that these terms are the same, I believe the majority opinion fails to give proper meaning to the selected words.

In construing a statute, words are to be given their ordinary and common meaning, unless they have acquired a technical or special legal meaning, or a different meaning is apparent from the context of the words.[3] I believe the same principle applies when considering language, as developed by case law. It seems to me one would not understand the term "negligence which manifests culpability" (or blameworthiness) to require "'more than negligence'" or conduct which is "'"more than 'blameworthy,'"'" as the majority opinion holds. And the context of this phrase does not suggest that such a meaning is more appropriate than its common meaning. Because we have not used the term "culpable negligence" in defining misconduct, I believe that its technical and legal definition is inapplicable here.

In reviewing the decision of an administrative tribunal on a petition in error, both the district court and the appellate court review the decision of the tribunal to determine whether it acted within its jurisdiction and whether the decision of the tribunal is supported by sufficient relevant evidence.[4] The evidence is sufficient, as a matter of law, if an administrative tribunal could reasonably find the facts as it did from the testimony and exhibits contained in the record before it.[5] Stated another way, the evidence is "sufficient as a matter of law" if a judge could not, were the trial to a jury, direct a verdict.[6] It is something less

---

[3] See 73 Am. Jur. 2d *Statutes* §§ 124 and 152 (2001). See, also, e.g., *State v. County of Lancaster*, 272 Neb. 376, 721 N.W.2d 644 (2006).

[4] *Barnett v. City of Scottsbluff*, 268 Neb. 555, 684 N.W.2d 553 (2004).

[5] *Id.*

[6] See *Eshom v. Board of Ed. of Sch. Dist. No. 54*, 219 Neb. 467, 471, 364 N.W.2d 7, 11 (1985).

than the weight of the evidence and can be such as to permit the drawing of two inconsistent conclusions.[7]

The record shows that Maxon, the emergency management director for the City of Grand Island and Hall County, and a committee of the Hall County Board of Supervisors (County Board) recommended increasing the 911 surcharge from $.50 to $1 per access line per month at a County Board meeting on July 11, 2000. The County Board voted to table the recommendation because it needed more information. The County Board did not address the 911 surcharge again until November 13, 2001.

Maxon testified that he worked on the recommendation during 2001. Springer, the treasurer and finance director of the City of Grand Island, testified that he asked Maxon several times that year if everything was "on track" for the surcharge to be increased starting on January 1, 2002. Maxon assured him that it was and also assured him that he would notify Qwest Communications, Inc., the main service supplier, of the change. But Maxon testified he discovered, "at the last minute," in 2001 that state law required notice to the telephone companies before a surcharge could be changed. The record, however, contains a letter from Qwest Communications, Inc., dated September 2000 that provided information that such notice was required.

Because the telephone companies did not receive proper notice, the 911 surcharge could not be put into effect for 2002 and was delayed until 2003. City officials estimated that Maxon's department lost $100,000 to $180,000 in revenue because of the delay. Maxon claims that he was not responsible for the failure to implement the 911 surcharge increase by 2002 because he "did everything [he] could to facilitate that process." Instead, he places the blame on the County Board for tabling the recommendation. But the testimony from city officials shows that Maxon was in charge of implementing the 911 surcharge. When asked why Maxon would be responsible for the delay and revenue loss, Springer testified, "[H]e was the director of the department . . . and he has the responsibility for that department for the revenues. He budgeted the revenue and he should

---

[7] See *id.*

have been following up on it." And, as stated above, Maxon had assured Springer that he was on track.

Under our standard of review, I believe that sufficient evidence supports the city council's decision to terminate Maxon's employment because of his mishandling of the 911 surcharge implementation. Maxon was in charge of the 911 surcharge, and he repeatedly assured city officials that he would have it done in time to be implemented in 2002. Nearly 1½ years passed between the first time the surcharge was presented to the County Board and the next time it appeared on the County Board's agenda. Yet, in all that time, Maxon neglected the notice requirements for the public hearing. And while he argues he was not at fault for the County Board's delay, the evidence suggests otherwise.

Despite Maxon's excuses, there was sufficient evidence to support that Maxon was negligent in implementing the 911 surcharge and that his negligence caused the city to lose significant revenue. I believe these facts fit the definition of misconduct as "negligence which manifests culpability." Thus, I would affirm.

WRIGHT, J., joins in this dissent.