**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 31, 2006

THE PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v                                                                   No. 128376

DARRYL PEALS,

Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

CORRIGAN, J.

We granted leave to appeal to consider whether the weapon at issue in this case constituted a "firearm" as defined in MCL 750.222(d), and thus whether defendant was properly convicted of being a felon in possession of a firearm, MCL 750.224f(1); and possession of a firearm during the commission of a felony, MCL 750.227b. We hold that the text of the statutory definition indicates that a weapon is a firearm if it is the type of weapon that was designed or intended to propel a dangerous projectile by an explosive, gas, or air. The definition describes the category of weapons that constitute a "firearm," but it does not prescribe a requirement that the weapon be "operable" or "reasonably or readily repairable."

In other words, the design and construction of the weapon, rather than its state of operability, are relevant in determining whether it is a "firearm."

It is not disputed that the weapon in this case is the type of weapon that propels dangerous projectiles. It thus qualifies as a firearm under the statutory definition. We therefore affirm the judgment of the Court of Appeals and affirm defendant's convictions of felon in possession of a firearm and felony-firearm.

I. Factual Background and Procedural Posture

A jury found defendant guilty of felon in possession of a firearm and felony-firearm. Testimony at trial explored the condition of the gun found in defendant's possession. Defendant testified that he found the gun lying in two pieces in the grass and that he picked up the pieces and put them in his pocket. Upon examining them later, he saw that there was damage and thought that the gun was inoperable.

The police officer who examined the gun when it was received into evidence testified that "the weapon did not function as it was mechanically designed to function." It was missing the firing-pin assembly, part of the slide (and the part that remained was cracked), the magazine, and some springs. He further acknowledged that without the firing-pin assembly, "you cannot fire a bullet through that weapon."

When asked whether, despite the broken slide, a round could be fired from the gun if the missing springs as well as the firing pin were replaced, the officer responded:

2

To the best of my knowledge the way this slide sits right now with the broken piece I don't even know that it would properly chamber around [sic]. The fact of the tension of the springs if it had all of the springs would probably not allow this slide to close completely anyway to actually fire it. If it had the proper stop but this portion here of the slide was broken you'd get one round off. But with the function of the weapon and the slide going to the rear and nothing to stop it that slide is going to come off . . . .

On further examination, the officer testified, "If this weapon fired a round with the springs and without having the ejector stop, you would loose [sic] the slide. It would eject completely to the rear and you wouldn't be able to get a second shot off."

Without objection, the trial court provided the following instruction to the jury regarding the operability of the gun:

A handgun need not be currently operable in order to qualify as a firearm for purposes of the offenses of felon in possession of a firearm and possession of a firearm at the time of the commission or attempted commission of a felony.

When the jury requested further clarification of what constitutes a firearm, the court stated:

A firearm includes any weapon from which a dangerous weapon [sic] can be shot or propelled by the use of explosive gas or air. A handgun need not be currently operable in order to be qualified as a firearm for the purposes of felon in possession of a firearm and possession of a firearm at the time of a commission or attempted commission of a felony.

Defendant did not object to this instruction.

3

The jury returned a verdict of guilty on both counts of felon in possession of a firearm and felony-firearm. The Court of Appeals affirmed defendant's convictions.[1]

## II. Standard of Review

This case requires us to interpret the definition of "firearm" contained in MCL 750.222(d). We review de novo questions of statutory construction. *People v Perkins*, 473 Mich 626, 630; 703 NW2d 448 (2005).

## III. Analysis

Initially, we note that both offenses of which defendant stands convicted, felon in possession of a firearm and felony-firearm, require proof that the defendant possessed a "firearm." The Legislature has defined that term in MCL 750.222(d):

> "Firearm" means a weapon *from which a dangerous projectile may be propelled by an explosive, or by gas or air*. Firearm does not include a smooth bore rifle or handgun designed and manufactured exclusively for propelling by a spring, or by gas or air, BB's not exceeding .177 caliber. [Emphasis added.]

On appeal, the sole challenge to defendant's convictions is that the weapon found in his possession was in such a state of disrepair that it could not constitute a "firearm" as defined in MCL 750.222(d).

---

[1] *People v Peals*, unpublished memorandum opinion of the Court of Appeals, issued February 15, 2005 (Docket No. 251406).

It is readily apparent that the key question in construing MCL 750.222(d) is the meaning of the word "may" in the phrase, "a dangerous projectile *may* be propelled . . . ." Where, as here, a statute does not contain internal definitions of terms used in it, we give terms their ordinary meaning. *Title Office, Inc v Van Buren Co Treasurer*, 469 Mich 516, 522; 676 NW2d 207 (2004). In such instances, it is often helpful to consult dictionary definitions. *Id. Random House Webster's College Dictionary* (1997) lists a number of definitions for "may" as an auxiliary verb:

> 1. (used to express possibility) . . . 2. (used to express opportunity or permission) . . . 3. (used to express contingency, esp. in clauses indicating condition, concession, purpose, result , etc.) . . . 4. (used to express wish or prayer) . . . 5. (used to express ability or power.) . . . .

Reviewing these definitions in the context of the statute, it seems that the third and fourth definitions are more compatible with the understanding that a weapon is a firearm if it was designed or intended to propel a dangerous projectile. The words "purpose," "wish," and "prayer" connote intention, aim, or planning. In other words, these definitions are consonant with the idea that a weapon is a firearm if that was the intent or design of its creator.

The first, second, and fifth definitions, meanwhile, seem more compatible with the understanding that a weapon is a firearm if it possesses the ability to propel a dangerous projectile. The words "opportunity," "possibility," "ability," and "power" connote capability or capacity. In other words, these definitions are

5

consonant with the idea that a weapon is a firearm if it has the ability or power to fire a projectile.

Because both of these meanings are plausible given the use of "may" in the statute, we are required to make a determination as to which meaning is most representative of the Legislature's intent. As will be discussed below, we conclude that the offenses of which defendant was convicted do not require proof that the firearm was "operable" or "reasonably or readily operable." Rather, the statute requires only that the weapon be of a type that is designed or intended to propel a dangerous projectile.[2]

We reach this conclusion on the basis of several considerations. Initially, to the extent that the "may" clause serves as a restrictive clause, narrowing the class of "weapons" that are included within MCL 750.222(d), as we understand it to do,[3] we believe it is more reasonable to view this clause as differentiating between weapons generally and a specific subclass of weapons, rather than as

---

[2] Justice Kelly suggests that because we believe that there are two plausible meanings to the statute at issue we must construe it in favor of the defendant. *Post* at 22. We note, however, that penal laws "are not to be construed so strictly as to defeat the obvious intention of the legislature." *United States v Wiltberger*, 18 US (5 Wheat) 76, 95; 5 L Ed 37 (1820). "The maxim is not to be so applied as to narrow the words of the statute to the exclusion of cases which those words, in their ordinary acceptation, or in that sense in which the legislature has obviously used them, would comprehend." *Id*. Because we believe that the words of the statute as a whole indicate an intent to include a broad definition, the rule of lenity does not force us to choose the stricter definition.

[3] Restrictive clauses are not set off by commas. Strunk & White, Elements of Style (3d ed) (New York: MacMillan Publishing Company, 1979), p 4.

6

differentiating between weapons generally and a specific subclass of weapons *and also* between weapons that are operable and weapons that are not.

Moreover, a definition of "may" that is focused on operability would produce results that we believe are unlikely to have been within the contemplation of the Legislature in defining "firearm." Consider by way of illustration, a length of narrow metal pipe that could be considered a weapon, given its potential for bludgeoning. Were "may" not to encompass some design component, it is conceivable that even a simple pipe could constitute a "firearm," something that is difficult to reconcile with the fact that it is a "firearm" that is the object of the "may" clause.

Next, the "operability" definition of "may" would enable a felon to possibly avoid prosecution by the simple expedients of separating his firearm into separate parts, hiding a critical part of the firearm, or discarding the firearm immediately after being seen possessing it so that its level of operability could not be determined. Given the manifest purpose of the instant statute as reflected in its text, this would impede firearms prosecutions for reasons that seem altogether arbitrary and irrational.

It is also noteworthy that in several instances, the Legislature has defined "dangerous weapon" to include a "loaded or unloaded firearm, *whether operable or inoperable*." See, e.g., MCL 750.110a(1)(b)(*i*); MCL 600.606(2)(b)(*i*); MCL 766.14(4)(b)(*i*) (emphasis added). While these statutes do not fall within the "firearms" chapter of the Michigan Penal Code, they are instructive on the

7

Legislature's understanding of what constitutes a "firearm."  If, as the dissent posits, "firearm" included an operability requirement, defining "dangerous weapon" to include a firearm "*whether operable or inoperable*" would be redundant.  "[T]his Court should interpret a statute to ensure that an interpretation of one provision does not render another superfluous in a substantial number of cases." *Western Michigan Univ Bd of Control v Michigan,* 455 Mich 531, 551-552; 565 NW2d 828 (1997).[4]

Further, as between the absence of express language in the statute that either references an operability or a design requirement, we believe that the absence of the former is more telling in light of the very next sentence of MCL 750.222(d), which defines a "firearm" in further detail in terms of what it was "designed" and "manufactured" to do.  Weapons from which a projectile "may" be

---

[4] Justice Kelly takes the opposite approach, suggesting that if "firearm" does *not* include an operability requirement, defining "dangerous weapon" in MCL 750.110a to include a firearm "whether operable or inoperable" would be redundant.  While at first blush, this may seem reasonable, we believe further consideration reveals ours to be the better analysis.  As noted, MCL 750.110a(1)(b)(*i*) refers to a "loaded or unloaded firearm, whether operable or inoperable."  If, as Justice Kelly suggests, our construction of "firearm" renders the phrase "whether operable or inoperable" redundant, we note that her construction renders *both* the phrases "loaded or unloaded" and "whether operable or inoperable" redundant.  After all, under her operability definition of "firearm," an unloaded gun would not be able to propel a projectile (as it has none to propel), and would therefore technically be inoperable.  In that sense, then, her definition of "firearm" would render multiple clauses of MCL 750.110a redundant.  Even if we agreed with her—which we do not—that our interpretation of "firearm" created a redundancy in MCL 750.110a, such interpretation would still be the better of the two constructions because it would result in fewer redundancies.

8

propelled are a subclass of weapons generally; because the Legislature only excluded from that subclass weapons "designed and manufactured exclusively for propelling . . . BB's," necessarily those weapons remaining in the subclass were "designed and manufactured" to propel a "dangerous projectile" other than BB's. Because the Legislature chose to focus on design in limiting the subclass of weapons that constitute firearms, it is reasonable to conclude that the Legislature focused on design in creating that subclass in the first instance. Put differently, the Legislature's use of "designed and manufactured" in the second sentence of the statute is telling with regard to which definition of "may" it intended in the first sentence. It seems apparent that the design—and not the current operability—of a weapon was of paramount importance to the Legislature in defining what constitutes a "firearm."[5]

Although the defendant relies on *People v Hill*, 433 Mich 464, 472-473; 446 NW2d 140 (1989), the holding in *Hill*, according to the *Hill* Court itself, does not apply to the offenses in this case. In *Hill*, two defendants were charged with possession of the same short-barreled shotgun, MCL 750.224b. Each defendant had possessed one of the two component parts that constituted the short-barreled shotgun. This Court ruled that the charges could go forward because "the fact that

---

[5] Contrary to Justice Kelly's assertion, we do not "ask[] the reader to ignore the differences in these sentences." *Post* at 19-20. Rather, we ask the reader to view the statute logically as a cohesive whole and not to artificially separate its component sentences.

9

a firearm is temporarily inoperable does not preclude prosecution for its possession where the statute expressly prohibits such possession." *Hill*, 433 Mich 466. This Court explained that "temporarily inoperable firearms which can be made operable within a reasonable time fall within the purview of the statutes that govern the use and possession of firearms." *Id.* at 477. This Court then qualified its holding, however, by explaining that it did "not purport to interpret the concealed weapon statute or the felony-firearm statute." *Id.*, n 13. The felon-in-possession statute had not yet been enacted when *Hill* was decided. Thus, *Hill* is not instructive because its holding appears limited to the offense at issue in that case, possession of a short-barreled shotgun.

The narrow reach of *Hill* is further clarified by a long line of Court of Appeals decisions holding that the felony-firearm statute does *not* require proof of operability. Indeed, the *Hill* Court itself cited and discussed many of those cases, without disapproving their holdings in any respect. The *Hill* Court explained:

> [C]ourts have held that it is unnecessary to prove the operability of a weapon as an element of a prosecution of possession of a firearm during the commission of a felony because this would be "'inconsistent with the legislative intent of discouraging the practice of carrying guns in circumstances where harm is apt to occur.'" *People v Jackson*, 108 Mich App 346, 350; 310 NW2d 238 (1981), citing with approval [*People v Gibson*, 94 Mich App 172, 177; 288 NW2d 366 (1979), rev'd on other grounds 411 Mich 993 (1981)]. [*Hill*, 433 Mich 475.]

The *Hill* Court further stated:

> Other panels holding that the operability of a firearm is not necessary for the prosecution of a felony-firearm charge include: *People v Garrett*, 161 Mich App 649; 411 NW2d 812 (1987), lv den

10

430 Mich 856 (1988); *People v Poindexter*, 138 Mich App 322; 361 NW2d 346 (1984); *People v Brooks*, 135 Mich App 193; 353 NW2d 118 (1984); *People v Broach*, 126 Mich App 711; 337 NW2d 642 (1983). [*Hill*, 433 Mich 475 n 9.]

In short, it is telling that (1) the *Hill* Court cited and discussed a long line of Court of Appeals case law holding that operability is *not* a requirement of a felony-firearm prosecution, (2) the *Hill* Court did *not* express any disapproval of the Court of Appeals decisions, and (3) the *Hill* Court expressly stated that it was *not* purporting to interpret the concealed weapons statute or the felony-firearm statute. *Hill* by its own terms does not support its expansion to the offenses of felony-firearm and felon in possession of a firearm. *Hill* thus provides no basis to reject the Court of Appeals longstanding view that proof of operability is not required.

Moreover, after the *Hill* decision, the Court of Appeals has continued to hold that proof of operability is not required in felony-firearm cases. In *People v Thompson*, 189 Mich App 85; 472 NW2d 11 (1991), the defendant argued that his felony-firearm conviction could not stand because the hammer of his handgun was broken, thus rendering it inoperable. The Court of Appeals rejected the defendant's argument: "Operability is not and has never been an element of felony-firearm. *People v Poindexter*, 138 Mich App 322, 333; 361 NW2d 346 (1984); see also *People v Garrett*, 161 Mich App 649, 653; 411 NW2d 812 (1987), and *People v Pierce*, 119 Mich App 780; 327 NW2d 359 (1982)." *Thompson*, 189 Mich App 86. The *Thompson* Court noted that "[i]t has long been

11

the practice of this Court to apply a reasonable interpretation of the felony-firearm statute in order to sustain the deterrent effect intended by the Legislature. See [*Hill*, 435 Mich 473-477]." *Thompson*, 189 Mich App 86-87.

In addition, the Court of Appeals has held, after *Hill*, that proof of operability is not required to establish the offense of felon in possession of a firearm. In *People v Brown*, 249 Mich App 382; 642 NW2d 382 (2002), the Court of Appeals noted that various meanings had been accorded to the term "firearm," depending on the offense with which the defendant had been charged. In the context of the concealed weapons statute, MCL 750.227, the Court of Appeals had held that an inoperable handgun was not a "firearm." See *People v Parr*, 197 Mich App 41, 45; 494 NW2d 768 (1992), *People v Gardner*, 194 Mich App 652, 654; 487 NW2d 515 (1992), and *People v Huizenga*, 176 Mich App 800, 804-805; 439 NW2d 922 (1989). But in the context of the felony-firearm statute, the *Brown* Court noted that Court of Appeals case law does not require proof of operability. See *Thompson*, *supra*; *Garrett*, *supra*; and *Poindexter*, *supra*. The *Brown* Court concluded "that the *Thompson* analysis, first applied to felony-firearm cases, should also be applied to felon in possession cases." *Brown*, 249 Mich App 384-385.

To support its conclusion, the *Brown* Court took note of MCL 750.2, which provides that the "rule that a penal statute is to be strictly construed shall not apply" to the provisions of the Michigan Penal Code, which "shall be construed according to the fair import of their terms, to promote justice and to effect the

objects of the law." Turning to the definition of "firearm" in MCL 750.222(d), which provides that a "firearm" is "a weapon from which a dangerous projectile *may be* propelled" (emphasis added), the *Brown* Court concluded "that a handgun that is designed to expel a dangerous projectile, and that could do so but for a missing firing pin and spring, qualifies under MCL 750.222(b) as a weapon from which a dangerous projectile *may* be propelled." *Brown*, 249 Mich App 386.

> The statutory language is broad and is clearly intended to keep any and all handguns out of the hands of convicted felons. In our opinion, a handgun need not be currently operable in order to qualify as a "firearm" for purposes of the felon in possession statute. If that were the case, then convicted felons could legitimately purchase, sell, receive, and distribute handguns on a regular basis, as long as the firing pins had been temporarily removed from those handguns. We cannot conclude that the Legislature intended such a result when it drafted the felon in possession statute. [*Id*.]

The *Brown* Court further rejected the defendant's argument that this Court's decision in *Hill* mandated a holding that an inoperable handgun was not a "firearm" for purposes of the felon in possession statute:

> We conclude that our holding in the instant case is consistent with the *Hill* decision, in which the Court noted the "legislative intent to distinguish the firearm from other potentially dangerous weapons," and cited appellate decisions which "found the operability of a gun to be irrelevant for a conviction [because] a contrary result would thwart the deterrent purpose" of the laws concerning the use and possession of firearms. [*Hill,* 433 Mich] 476, quoting *People v Boswell*, 95 Mich App 405, 408-409; 291 NW2d 57 (1980). [*Brown*, 249 Mich 387.]

In short, the *Brown* Court explained why its holding was *consistent* with *Hill*. We find no basis in *Hill* to question the *Brown* Court's analysis or the Court of Appeals longstanding interpretation of "firearm."

13

Of the long line of cases left undisturbed by *Hill*, a case that offers particularly useful analysis is *Boswell*, *supra*. In that case, the defendant pleaded guilty of armed robbery, MCL 750.529; and felony-firearm. On appeal, he argued that the gun used in the robbery was temporarily inoperable because it was "jammed" and thus was not a "firearm" under the definition contained in MCL 8.3t. MCL 8.3t defines "firearm" in a manner that is very similar to the definition contained in MCL 750.222(d). Specifically, MCL 8.3t provides that a "firearm" is "any weapon from which a dangerous projectile may be propelled by using explosives, gas or air as a means of propulsion, except any smooth bore rifle or handgun designed and manufactured exclusively for propelling BB's not exceeding .177 calibre by means of spring, gas or air."

The *Boswell* Court explained its interpretation of the statutory definition:

> We believe the statute demonstrates a legislative intent *to distinguish the firearm from other potentially dangerous weapons by describing its general construction and manner of use*. The gun used in the instant case clearly falls within the above definition. Furthermore, this Court found the operability of a gun to be irrelevant for a conviction under MCL 750.227; MSA 28.424, carrying a concealed weapon, in *People v Clark*, 24 Mich App 440; 180 NW2d 342 (1970), and *People v Jiminez*, 27 Mich App 633; 183 NW2d 853 (1970). The same reasoning is equally apt here, and a contrary result would thwart the deterrent purpose of the felony-firearm statute. [*Boswell*, 95 Mich App 409 (emphasis added).]

The *Boswell* analysis is useful in analyzing the text of the provision at issue here, MCL 750.222(d). The statute defines a "firearm" as "a weapon from which a dangerous projectile may be propelled by an explosive, or by gas or air." This language serves to *distinguish* firearms, which are a particular type of weapon,

14

from weapons generally. A firearm is designed and used to expel dangerous projectiles by an explosive, gas, or air. By contrast, other weapons, such as knives and clubs, are not designed or used in this manner. It is the design and construction of a firearm, rather than its current state of operability, that distinguish it from other weapons.

We decline to insert an operability requirement into the statute. We can find no basis to conclude that the phrase "may be propelled" somehow requires that the weapon be reasonably and readily operable. The statute simply does not contain any language supporting such a rule. In short, the statutory definition of "firearm" is *descriptive*. It describes the type of weapon that constitutes a "firearm," so as to distinguish it from other types of weapons. It does *not* require the current operability of the weapon.

This conclusion is supported by definitions of other terms contained in MCL 750.222. The surrounding provisions use the term "firearm" as a predicate or base term to define specific *types* of firearms. Thus, the term "firearm" is used to define the terms "pistol," MCL 750.222(e); "shotgun," MCL 750.222(h); and "rifle," MCL 750.222(j). This use of "firearm" to define *other*, more specific types of firearms explains why the Legislature used general language to describe the manner of use or operation of a "firearm," i.e., that it is "a weapon from which a dangerous projectile may be propelled," so that the Legislature could then use this general descriptive term to define more specific types of firearms. We are

15

bound to accord this clear meaning to the statutory text rather than invent an operability requirement that simply is not there.[6]

Our conclusion is further supported by a key difference between the language used to define "firearm" in MCL 750.222(d) and the language used in another definition of that term in MCL 752.841. The latter statutory definition applies to offenses that prescribe the duties of a person who discharges a firearm and thereby injures another person. For purposes of those offenses, MCL 752.841 defines the word "firearm" as "any weapon or device from which *is* propelled any missile, projectile, bullet, shot, pellet or other mass by means of explosives,

_____

[6] Although it is not necessary to our analysis, we note that the New Jersey Supreme Court has construed very similar statutory language as not requiring proof of operability. In *State v Gantt*, 101 NJ 573; 503 A2d 849 (1986), the court interpreted a statutory definition of "firearm" that referred to "'any gun, device or instrument in the nature of a weapon *from which may be fired or ejected* any solid projectable ball, slug, pellet, missile or bullet, or any gas, vapor or other noxious thing, by means of a cartridge or shell or by the action of an explosive or the igniting of flammable or explosive substances.'" *Id*. at 582 (emphasis added). The New Jersey Supreme Court held that the statutory phrase "'from which may be fired'" did not require proof of operability. Rather, the Court concluded that the statute merely required proof that the weapon was originally *designed* to deliver a lethal force.

See also *Williams v State*, 61 Ga 417, 418 (1878):

An object once a pistol does not cease to be by becoming temporarily inefficient. Its order and condition may vary from time to time, without changing its essential nature or character. Its machinery may be more or less perfect; at one time it may be loaded, at another empty; it may be capped or uncapped; it may be easy to discharge or difficult to discharge, or not capable, for the time, of being discharged at all; still, while it retains the general characteristics and appearance of a pistol, it is a pistol, and so in common speech would it be denominated.

16

compressed air or gas or by means of springs, levers or other mechanical device." (Emphasis added.) MCL 752.841 makes clear that the Legislature knows how to define a "firearm" as a weapon from which a projectile "*is* propelled." We believe that the Legislature would not have used the phrase "*may* be propelled" in MCL 750.222(d) to require operability when it could have instead used the phrase "is propelled" as it did in MCL 752.841.

Therefore, because we can find no textual support for an operability requirement, we must adhere to the Legislature's judgment not to adopt such a rule.[7]

Moreover, were we to extend *Hill's* operability requirement to the crimes of felon in possession and felony-firearm, it could well encourage defendants to discard or secrete their weapons in order to impede the prosecution from being able to prove that the weapon could reasonably and readily be made to fire, or to separate their weapons into multiple parts for the same purpose. After disposing

---

[7] While the statute does not contain an operability requirement, it is possible that a firearm could be so substantially redesigned or altered that it would cease to be a "firearm" under the statutory definition. It would no longer be a weapon whose design was such that a dangerous projectile "may be propelled" by an explosive, gas, or air. For example, an antique cannon plugged with cement on display in a park would not constitute a "firearm" under MCL 750.222(d). That is because the cannon has been converted into an ornamental display, and it is no longer the type of weapon that is used or designed to propel dangerous projectiles by an explosive or by gas or air. We emphasize, however, that the operability of the weapon is not the statutory test; rather, the question is whether the weapon has been so substantially redesigned or altered that it no longer falls within the category of weapons described in MCL 750.222(d).

of or hiding the weapon, the defendant or—if the defendant did not wish to testify—a defense witness could simply take the stand and testify that the gun was inoperable, and the prosecution would then have no means to establish the contrary beyond a reasonable doubt. *Id*.[8]

Indeed, our Court of Appeals made this very point in *Pierce*, 119 Mich App 782-783:

> If the prosecution must prove operability, a defendant could not be convicted of felony-firearm if the gun is never recovered even if the victim testifies that he saw the gun. A prime concern behind the felony-firearm statute is to protect the victim. The victim is no less frightened if the gun (most likely unknown to him) just happens to be inoperable. The state clearly intends to protect such a victim. [Citation omitted.]

An extratextual operability requirement would also undermine the legislative intent to deter the possession of firearms by convicted felons and by persons committing felonies. That a gun is inoperable does not alleviate the extreme danger posed by its possession in these circumstances.

In short, expanding an operability requirement to the offenses of felony-firearm and felon in possession of a firearm would defeat the fundamental legislative interest in deterring the possession of firearms.[9] Whether operable or

---

[8] See also *New Jersey v Gantt*, 101 NJ 586 (stating that an operability requirement "would invariably invite assertions of inoperability by defendants hopeful of gaining some advantage in the murky waters of law characteristic of rebuttable presumptions and shifting burdens of proof").

[9] In an appropriate case, this Court's holding in *Hill* may require reexamination. We decline to overrule *Hill* in this case because: (1) the defendant

(continued…)

18

not, firearms pose a grave danger to members of the public when they are possessed by convicted felons or persons committing felonies.

## IV. Response to the Dissent

In her dissent, Justice Kelly articulates her preferred interpretation of the statutory definition of "firearm" as containing an operability requirement. Justice Kelly then asserts that because the majority does not adopt her interpretation, we have somehow abandoned our judicial philosophy of applying the plain meaning of a statutory text. *Post* at 13. She further contends that we have violated our "'plain text philosophy,'" *post* at 16, because, unlike Justice Kelly, we have not focused our analysis on a *federal* statute that has no application to this case.

It should go without saying that our judicial philosophy does not require every member of this Court to agree with Justice Kelly's interpretation of a text. It is therefore unfortunate that Justice Kelly has resorted to the classic logical fallacy of a false choice: she seems to contend that we must either (1) agree with her interpretation of the text or (2) abandon our entire philosophy. We decline to

_____

(…continued)

in *Hill* was convicted of an offense, possession of a short-barreled shotgun, that is not at issue here; (2) the definition of "firearm" construed in *Hill*, while very similar to the definition here, is located in a different statutory section, MCL 8.3t; (3) the *Hill* Court narrowed its holding considerably by declining to construe the term "firearm" for other firearms offenses; and (4) the *Hill* Court discussed the Court of Appeals longstanding construction of the term "firearm" in the felony-firearm context without expressing any disapproval of that construction. Nonetheless, we recognize that an argument can be made that the term "firearm" should have the same meaning for different offenses, and we will consider this issue further when and if it arises in an appropriate case.

dignify this argumentative sleight of hand by further responding to it, other than to emphasize that we have endeavored to apply the text as written and that we stand by our interpretative analysis as set forth above.

Justice Kelly also argues that the rule of lenity and the constitutional principle of fair warning require us to construe the statute in favor of the defendant. Yet Justice Kelly herself has recently acknowledged in another case that "fair warning is given only if *an ambiguity* in a criminal statute is construed to apply to conduct that the statute clearly designates as criminal." *People v Yamat*, 475 Mich 49, 66; 714 NW2d 335 (2006) (Kelly, J., dissenting), citing *United States v Lanier*, 520 US 259, 266; 117 S Ct 1219; 137 L Ed 2d 432 (1997). Despite her recent observation in *Yamat*, Justice Kelly here has failed to identify an ambiguity in the statutory definition of "firearm."

As discussed, we believe the statutory definition of "firearm" is clear. MCL 750.222(d) plainly provides that a weapon is a firearm if it is the type of weapon that propels dangerous projectiles by an explosive or by gas or air. Moreover, as noted earlier, the existing Court of Appeals case law provides that inoperability is not a defense to either felony-firearm or felon in possession of a firearm. See *Thompson* and *Brown* and the cases they cite.

Amazingly, Justice Kelly relies for her fair warning argument on *Hill*, in which this Court (1) addressed an offense, possession of a short-barreled shotgun, *that is not at issue in this case*, (2) expressly declined to extend its holding to felony-firearm, and (3) acknowledged the Court of Appeals longstanding

20

interpretation of the felony-firearm statute as not containing an inoperability defense. Justice Kelly's fair warning argument thus collapses of its own weight in light of her reliance on *Hill*.

## V. Conclusion

The presence of the word "may" in MCL 750.222(d) indicates the Legislature's intention that a weapon be considered a firearm if it was designed or intended to propel a dangerous projectile by means of an explosive, gas, or air. In the absence of a legislative enactment of an operability requirement, we hold that there is no operability requirement for the offenses of felony-firearm and felon in possession of a firearm. Because there is no dispute that the weapon possessed by defendant in this case was the type of weapon that was designed to propel a dangerous projectile by an explosive, gas, or air, we affirm the judgment of the Court of Appeals and affirm defendant's convictions of felony-firearm and felon in possession of a firearm.

Maura D. Corrigan
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

21

STATE OF MICHIGAN

SUPREME COURT


THE PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellee,

v                                      No. 128376

DARRYL PEALS,

     Defendant-Appellant.

_____

WEAVER, J. (*concurring*).

I concur in the result of the majority opinion that affirms defendant's convictions of felon in possession of a firearm, MCL 750.224f(1); and possession of a firearm during the commission of a felony, MCL 750.227b.

Both convictions in this case involve the statutory definition of "firearm," MCL 750.222(d). MCL 750.222(d) defines "firearm" as "a weapon from which a dangerous projectile may be propelled by an explosive, or by gas or air. Firearm does not include a smooth bore rifle or handgun designed and manufactured exclusively for propelling by a spring, or by gas or air, BB's not exceeding .177 caliber."

I write separately because the majority's interpretation of the word "may" to exclude consideration of a weapon's operability and require only consideration of a weapon's design is both overinclusive and underinclusive.

A fair reading of the phrase "may be propelled" does not require that the weapon be currently capable of propelling a dangerous projectile. It only requires that a projectile could be propelled from the weapon at some time. Thus, contrary to the majority's suggestion, *ante* at 7, a "simple pipe" could qualify as a firearm under the plain terms of the statute. A simple pipe can in fact be made to propel a dangerous projectile with, for example, air. That does not mean that any felon caught carrying a simple pipe should be charged with felony-firearm. But if the felon is carrying the components of a functional blow gun or pipe gun, the simple pipe might be capable of propelling a dangerous projectile. I would not summarily exclude such weapons from the definition of "firearm."

I would hold that a weapon from which a dangerous projectile may be propelled by an explosive, or by gas or air, and which is not permanently inoperable, qualifies as a firearm under MCL 750.222(d). Rather than injecting a design component into, or excluding an operability component from, the definition of "firearm," I would continue to review the facts of each case in light of the clear language of the statutory definition of "firearm."

The testimony presented suggested that the weapon found in defendant's possession could have been repaired to allow it to fire one round. The officer who examined the gun when it was received in evidence testified, "If it had the proper

2

stop but this portion here of the slide was broken you'd get one round off." While there was extensive testimony regarding the weapon's state of disrepair, there was no testimony at trial to contradict the potential that replacing some pieces may have allowed the weapon to fire.

Thus, the evidence presented at trial qualifies the weapon found in defendant's possession as a "firearm" under MCL 750.222(d). For that reason, I would affirm the judgment of the Court of Appeals that affirmed the defendant's jury convictions.

Elizabeth A. Weaver

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v                                                                                    No. 128376

DARRYL PEALS,

       Defendant-Appellant.

_____

KELLY, J. (*dissenting*).

This case calls on us to determine the meaning of "firearm" as defined in MCL 750.222(d). The majority has given it a meaning not supported by the text of the statute, rendering the statute constitutionally infirm. As the majority now construes it, the statute violates the rule of lenity and the requirements of fair warning. Because of these errors, I must dissent. I would reverse the judgment of the Court of Appeals and remand the case for a new trial.

RELEVANT FACTUAL BACKGROUND

Defendant spotted pieces of metal lying in the grass. On closer inspection, he noted that they were parts of a handgun. He pieced them together but testified that the mechanism could not be made to operate as a firearm. He stated that he decided to keep it in hopes of selling it later as scrap metal, which he collected and sold occasionally for extra money. Defendant testified that he would not have picked up a real gun.

Twenty minutes after defendant picked up the handgun parts, police officers stopped the car in which defendant was a passenger for a traffic violation. When asked, defendant informed an officer that he had the scrap-metal gun in his pocket. He told the officer that it did not work. After arresting him, the officer inspected the gun. She noticed that it had sustained significant damage and had no ammunition clip. She described its slide as "raggedy." When the officer again examined the gun at the precinct, she removed the safety, and the gun fell apart in her hands. She and her partner laughed at its poor condition.

The officer in charge of the case forwarded the gun to the firearm identification and explosive disposal unit for testing. Tests determined that the gun would not fire in the condition that it was in. The firing-pin assembly was entirely missing. The magazine was missing. And the top portion of the slide was cracked and missing.

Despite these facts, the prosecution charged defendant with being a felon in possession of a firearm (felon in possession)[1] and carrying or possessing a firearm when committing or attempting to commit a felony (felony-firearm).[2] At trial, attention focused on the operability of the scrap-metal gun.

A police officer reiterated that many pieces were missing from the gun, including the firing-pin assembly, the magazine, some springs, and part of the

---

[1] MCL 750.224f.

[2] MCL 750.227b.

2

slide. He also noted that what remained of the slide was cracked. He concluded that the gun would not function as it was designed to function. When specifically asked whether, if the missing firing-pin assembly and springs were replaced, the gun could be made to fire, the officer equivocated. Because of the broken slide, he stated that he did not know if the gun could ever chamber a round and that the slide likely could never close properly. The officer stated that, if someone could get a round off, the gun certainly could not fire a second shot.

At the close of trial, the judge instructed the jury that a handgun need not be currently operable in order to qualify as a firearm. When asked for clarification on this point, the judge reiterated that a handgun need not be currently operable to be qualified as a firearm for purposes of felon in possession and felony-firearm. The jury returned a guilty verdict on both counts.

Defendant appealed to the Court of Appeals, which decided the case without oral argument. It stated that current inoperability of a firearm is not a defense to felon in possession or felony-firearm. And it concluded that, on the basis of its reading of the facts, the evidence did not show that the gun was unusable as a firearm. The Court of Appeals affirmed both convictions. *People v Peals*, unpublished memorandum opinion of the Court of Appeals, issued February 15, 2005 (Docket No. 251406). We granted leave to appeal. 474 Mich 886 (2005).

3

*PEOPLE V HILL*[3]

Neither the felon-in-possession statute nor the felony-firearm statute defines the term "firearm," but it is defined elsewhere in the Michigan Penal Code. MCL 750.222(d) provides: "'Firearm' means a weapon from which a dangerous projectile may be propelled by an explosive, or by gas or air. Firearm does not include a smooth bore rifle or handgun designed and manufactured exclusively for propelling by a spring, or by gas or air, BB's not exceeding .177 caliber." Although this Court has not before been asked to determine the meaning of MCL 750.222(d), we did discuss a strikingly similar statute in *People v Hill*.

The two defendants in *Hill* faced the charge of possession of a short-barreled shotgun. MCL 750.224b. Each possessed separate parts that together made one shotgun. *Hill*, 433 Mich 466. To determine the meaning of the term "shotgun," the Court turned to the definition of "firearm." MCL 750.222 did not contain a definition of "firearm" at that time. Therefore, the Court referred to MCL 8.3t, which provides:

> The word "firearm," except as otherwise specifically defined in the statutes, shall be construed to include any weapon from which a dangerous projectile may be propelled by using explosives, gas or air as a means of propulsion, except any smooth bore rifle or handgun designed and manufactured exclusively for propelling BB's not exceeding .177 calibre by means of spring, gas or air.

---

[3] 433 Mich 464; 446 NW2d 140 (1989).

The Court stated that the words of a statute should be read in the way that best harmonizes with the ends the Legislature sought to achieve. *Hill*, 433 Mich 474 n 8. The following purpose was noted for the firearm laws:

> "Statutes making it unlawful to have or carry weapons are designed to suppress the act or practice of going armed and *being ready for offense or defense in case of conflict with another*, and to outlaw instruments ordinarily used for criminal and improper purposes. . . . The statutes should receive a reasonable construction in accord with the purpose of the legislature and in the light of the evil to be remedied, and they should be construed with the thought in mind that they are aimed at persons of criminal instincts and for the prevention of crime . . . .
>
> \* \* \*
>
> "A deadly weapon does not cease to be such by *becoming temporarily inefficient*, nor is its essential character changed by dismemberment if the parts, *with reasonable preparation, may be easily assembled so as to be effective*." [*Id*. at 473, quoting 94 CJS, Weapons, § 2, pp 479-480, and § 6, p 489 (emphasis added).]

*Hill* reasoned that, to effectuate this intent, the statute should not be limited to the narrowest of circumstances. Therefore, the Court concluded that a temporarily inoperable shotgun remains within the meaning of the term "firearm." This is because the temporarily inoperable shotgun maintains its "man-killing" status. *Id*. at 477. The Court concluded: "Thus, temporarily inoperable firearms which can be made operable within a reasonable time fall within the purview of the statutes that govern the use and possession of firearms." *Id*.

The majority claims that *Hill* is "not instructive" because the *Hill* Court did not purport to interpret the concealed weapons and felony-firearm statutes. *Ante* at 10. I disagree. Whereas it is true that *Hill* is not controlling in this case, it is

5

certainly instructive. MCL 8.3t and MCL 750.222(d) are nearly identical. The central components of the definitions, "[a or any] weapon from which a dangerous projectile may be propelled," are *identical*. It is the words "may be propelled" that are the central focus of the case before us. At the very least, the interpretation of the identical words in a related statute should provide the Court guidance in reaching a conclusion in this case. The majority's contentions to the contrary are puzzling.[4]

This Court should grant *Hill* its appropriate value as strongly influential precedent and reach the same conclusion as *Hill* did. That is, a weapon qualifies as a firearm only if it can be made operable within a reasonable time. This is true because the general intent behind the felon-in-possession statute and the felony-firearm statute is the same as the intent for the statute concerning possession of a short-barreled shotgun. *Hill* noted as much. "Statutes making it unlawful to have or carry weapons are designed to suppress the act or practice of going armed and *being ready for offense or defense in case of conflict with another . . . .*" *Hill*, 433 Mich 473 (emphasis added; citation omitted).

A person carrying a gun that cannot be reasonably and readily repaired is not "ready for offense or defense in case of conflict." Instead, that person is

---

[4] Almost simultaneously with this decision, the majority specifically stated that "absolutely identical phrases in our statutes" should have identical meanings. *Paige v Sterling Hts*, 476 Mich ___, ___; ___ NW2d ___ (Docket No 127912, decided July 31, 2006, slip op at 25.)

similarly situated to someone carrying a stick, a club, or a piece of metal. A person carrying a piece of iron rebar could not be convicted of felon in possession or felony-firearm, regardless of his or her intended use for that rebar. There is no reason to treat a person carrying a hunk of scrap metal that formerly functioned as a firearm any differently. Neither can be used to shoot someone, which is the man-killing status intrinsic in a firearm and which is what the Legislature intended to regulate.[5]

The majority claims that, unless it reads a "design" requirement into the statute, a piece of pipe could constitute a firearm. *Ante* at 7. But, under the majority's interpretation of MCL 750.222(d), a piece of pipe that had once been part of a gun, for instance the barrel of a shotgun, would also constitute a firearm. This would be true even if there is no significant difference between the two pipes. The majority asserts that it makes little sense to rule that a piece of pipe constitutes a firearm. I question then, what sense would there be in finding that a former gun barrel constitutes a firearm? I submit that there is no sense in the majority's design requirement and that the Legislature never intended it to exist.

---

[5] The majority claims that the inoperability of a firearm does not alleviate the extreme danger posed by its possession. This statement clearly is not true. Given that such a gun cannot be made to fire within a reasonable time, it does not pose the danger the Legislature sought to regulate. Allowing for an inoperability defense is the only way to effectuate the intent of the Legislature, which was to regulate the killing ability of firearms. An inoperable firearm no longer has that killing ability. The majority provides no basis for its assertion that the Legislature intended the statutes in question to protect people from a gun that could not fire.

In addition to adding a "design" requirement to the language of MCL 750.222(d), the majority has added a "redesign" defense to the crime. *Ante* at 17 n 7. It has been obliged to do so to avoid an absurd result. If it did not, certain people would be guilty of felon in possession by sitting near or leaning on a plugged cannon on display in a park.

But in fabricating its "redesign" defense, the majority has reverted to a defense based on operability, albeit one available only in special circumstances. Consider the cannon in the park. The sole "redesign" that has occurred and that is relevant is that which has rendered the cannon incapable of firing a projectile. The majority offers no explanation or support from the text of the statute for reading into the statute this redesign/limited operability defense. By contrast, *Hill* offers ample support for allowing all defendants to raise an inoperability defense when appropriate.

The majority's discussion of the cannon in the park implies that a firearm can be "redesigned" to no longer constitute a firearm. But the majority fails to indicate at what point a "redesigning" occurs. And it fails to explain why a "redesigning" did not occur when the gun in this case was extensively damaged. At the very least, under the majority's ruling, the question of whether the scrap-metal gun was sufficiently "redesigned" should be a question of fact for the jury. The majority should explain what has justified it to take this question from the jury. Why has the case not been remanded for trial?

8

Today's interpretation of MCL 750.222(d) raises more questions than it answers. Instead of raising unanswered questions by inventing a new redesign/partial operability defense as the majority has done, I would continue to follow the well-reasoned rule of law articulated in *Hill*.

There is strong evidence that defendant, when arrested, carried no more than pieces of scrap metal that were once parts of a firearm. If this is true, they do not meet the definition of "firearm" in MCL 750.222(d). If the gun could not reasonably and readily be repaired, its essential character had changed. If it could not "'be easily assembled so as to be effective,'" it would no longer be a firearm. See *Hill*, 433 Mich 473 (citation omitted).

Whether a gun is more than temporarily inoperable and therefore not a firearm is a question of fact that should be left to the jury. *People v Gardner*, 194 Mich App 652, 655; 487 NW2d 515 (1992); see also *Hill*, 433 Mich 480. In this case, the trial court instructed the jury that a handgun need not be currently operable to qualify as a firearm. This instruction was insufficient to meet the requirements of MCL 750.222(d) and *Hill*. Anything more than temporary inoperability is a defense to a crime involving a firearm.[6]

---

[6] The majority contends that allowing an inoperability defense will encourage suspects to discard or secrete their weapons. A desire to hide a weapon exists in every case. Rare indeed is a felon who would gladly turn his or her weapon over to the police after having used it to commit a crime.

If the majority is implying that a felon is encouraged to disable his or her weapon by my interpretation, I would state that there is no suggestion in the case

(continued…)

Defendant did not object to the trial court's instruction and did not ask for an instruction on inoperability.[7] However, the jury was improperly instructed, and the error constituted plain error requiring reversal. There are three requirements under the plain error rule: (1) the error must have occurred, (2) it must have been clear or obvious, and (3) it must have adversely affected the defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Reversal is required if the error resulted in the conviction of an actually innocent defendant or gravely and adversely affected the fairness, integrity, or public reputation of the judicial proceedings. *Id.*, quoting *United States v Olano*, 507 US 725, 736-737; 113 S Ct 1770; 123 L Ed 2d 508 (1993).

In this case, it is clear and obvious that the trial court failed to give an instruction on the defense of inoperability of the firearm. This adversely affected defendant's substantial right to a properly instructed jury and his substantial right to present a defense. Instructions to a jury must include material issues, defenses, or theories as long as there is evidence to support them. *People v Reed*, 393 Mich 342, 349-350; 224 NW2d 867 (1975). In this case, the operability of the firearm

---

(…continued)
before us that defendant disabled a firearm. I note that any proof that a defendant disabled a weapon would indicate that it was reasonably and readily repairable at the time of the crime.

[7] The standard criminal jury instructions provide such an instruction. CJI2d 11.6 states: "It is not against this law to carry a gun that is so [out of repair / taken apart with parts missing / welded together / plugged up] that it is totally unusable as a firearm and cannot be easily made operable."

was crucial. Whether defendant possessed an actual firearm or a hunk of scrap metal was the central question. Because an instruction on this important issue was omitted, the jury instructions were inadequate to protect defendant's substantial right to a properly instructed jury. *Id.*

It is basic law that a defendant must be allowed to confront the charges against him or her and defend against them. "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v Mississippi*, 410 US 284, 294; 93 S Ct 1038; 35 L Ed 2d 297 (1973). In not instructing the jury on the inoperability of a firearm here, the court robbed defendant of his ability to fully defend against the state's accusation that he possessed a firearm. Therefore, he was not allowed to present an appropriate defense. Given that this raises due process questions, the failure adversely affected defendant's substantial rights.

This plain error requires reversal. It meets both of the possible reasons for reversal articulated in *Carines*. First, because there was significant evidence that defendant possessed mere scrap metal, there is a legitimate chance that defendant is actually innocent. Second, failure to instruct the jury on the issue that was central to the case robbed defendant of his defense. Because this raises due process concerns, the error affects the fairness and the public reputation of the proceedings. Under such circumstances, defendant is entitled to a remand for a new trial. *Carines*, 460 Mich 763.

11

THE MEANING THE MAJORITY READS INTO MCL 750.222(d)
IS NOT SUPPORTED BY ITS TEXT

As indicated before, MCL 750.222(d) provides, in part: "'Firearm' means a weapon from which a dangerous projectile may be propelled by an explosive, or by gas or air." The majority seizes on the phrase "may be propelled" as distinguishing firearms from other weapons. It concludes that "may be propelled" refers to the design and manner of use of the weapon. To reach the majority's conclusion requires reading the word "may" to mean "designed to." The majority reads the statute as if it states: "'Firearm' means a weapon from which a dangerous projectile is designed to be propelled . . . ."

None of the common definitions of "may" supports such a reading. The *Random House Webster's College Dictionary*[8] (2001) defines "may" as an auxiliary verb:

> 1. (used to express possibility): *It may rain. You may have been right*. 2. (used to express opportunity or permission): *You may enter*. 3. (used to express contingency, esp. in clauses indicating condition concession, purpose, results, etc.): *strange as it may seem*; *Let us concur so that we may live in peace*. 4. (used to express wish or prayer): *Long may you live*! 5. *Archaic.* (used to express ability or power) — ***Idiom***. 6. **be that as it may,** whether or not that is true. [Emphasis original.]

The word "design" or "designed" is never used in these definitions. Nor can "designed" be read into them. It is simply not there.

---

[8] There was no change in the dictionary's treatment of "may" between the 1997 edition used by the majority and the 2001 edition.

The majority contends that the third and fourth definitions of "may" are consistent with a "design" requirement. Even a casual reading of these definitions will show the reader that this is untrue. Moreover, it should be noted that the majority did not include the sentences offered by the dictionary as typical examples of usage of the word. An attempt to place "designed" into the dictionary's sentences will show that "design" cannot replace "may." The examples from the third definition would read: "*strange as it [designed] seem*; *Let us concur so that we [designed] live in peace*." The example from the fourth definition would read: "*Long [designed] you live*!"

This demonstrates how untenable and extraordinary the majority's claims regarding the meaning of "may" are. I have not selected sentences that illustrate usages of "may" that are particularly inapplicable. If sentences using all possible dictionary usages were included here, it would become apparent that none fits the majority's reading of "may." The sensible conclusion must be that the majority's reading of "may" to mean "designed" is not plausible.

The majority has frequently claimed that it does no more than read the text of a statute in order to interpret it.[9] But here it appears to abandon that philosophy. It adds meaning to the statute that the Legislature chose not to give and that no dictionary furnishes.

_____

[9] I encourage readers to compare the majority's rationale in this case to the rhetoric it used in *Paige,* 476 Mich ___.

13

The majority claims that no language in the statute supports an operability requirement. But, in fact, the very first definition of "may" supports an inoperability defense. "May" is used to express possibility. *Random House Webster's College Dictionary* (2001). Using this definition of "may" in MCL 750.222(d), we find that, to be a firearm, a weapon must possess the possibility of propelling a dangerous projectile. Such a possibility is realized only when the weapon is reasonably and readily made to fire. Therefore, in contrast to the majority's "design" requirement, the text of MCL 750.222(d) actually supports an operability requirement.

It is only by ignoring the text of the statute and through a tortured definition of the word "may" that the majority reaches its result. In reality, the majority is interpreting the law to read like what it wishes the Legislature had written. Yet it is well settled that, when construing a statute, a reviewing court is supposed to assume that the words chosen by the Legislature are intentional. We should not speculate that the Legislature inadvertently used one word or phrase when it intended another. *Detroit v Redford Twp*, 253 Mich 453, 456; 235 NW 217 (1931).

The Legislature certainly could have written the language "designed to be propelled" into MCL 750.222(d) had it wished to do so. 18 USC 921(a)(3) provides an example in which Congress did just that:

> The term "firearm" means (A) any weapon (including a starter gun) which will or *is designed to* or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or

14

receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.  [Emphasis added.]

The majority reads MCL 750.222(d) as having almost the same breadth as 18 USC 921(a)(3).  This is inappropriate.  18 USC 921(a)(3) has been in effect since at least 1968.  Had the Michigan Legislature intended to enact a statute similar to 18 USC 921(a)(3), it could have copied the language from the federal statute.  But it chose not to do so.  Its choice should be respected.

Moreover, the Michigan Legislature has fully demonstrated its familiarity with 18 USC 921(a)(3).  It wrote MCL 380.1311, which concerns the expulsion and suspension of students.  Contained in the statute is a definition of "firearm."  It provides:  "'Firearm' means that term as defined in section 921 of title 18 of the United States Code, 18 USC 921."  MCL 380.1311(11)(d).  The Legislature chose this definition of "firearm" for MCL 380.1311(11)(d) but not for MCL 750.222(d), a fact that severely undermines the majority's argument in this case.

We have recognized that "[c]ourts cannot assume that the Legislature inadvertently omitted from one statute the language that it placed in another statute, and then, on the basis of that assumption, apply what is not there." *Farrington v Total Petroleum, Inc*, 442 Mich 201, 210; 510 NW2d 76 (1993).  But the majority does just that, today.  In MCL 380.1311(11)(d), the Legislature used the term "designed" by adopting the definition contained in 18 USC 921(a)(3).  In MCL 750.222(d), the Legislature chose not to use that definition or the word "designed."   The majority assumes that this choice was a mistake by the

15

Legislature and reads "designed" into MCL 750.222(d). This is contrary to well-established rules for interpreting a statute and violates the majority's claimed "plain text philosophy."

The majority characterizes 18 USC 921(a)(3) as irrelevant. But that it is relevant becomes apparent when we consider that the Michigan Legislature specifically adopted the language of 18 USC 921(a)(3) as its own in MCL 380.1311(11)(d). The majority has not and cannot explain what renders MCL 380.1311(11)(d) irrelevant. It has become part of Michigan law. Well-established rules of statutory construction require that we pay respect to legislative enactments. The Michigan Legislature included a "design" requirement in MCL 380.1311(11)(d). It did not include it in MCL 750.222(d). We cannot assume that the Legislature omitted from one statute through inadvertence the language it placed in another. *Farrington*, 442 Mich 210. I respect its choice. The majority does not.

I would respect the difference between MCL 750.222(d) and MCL 380.1311(11)(d). And I would not read the definitions to be equivalent. Because the Legislature chose to leave "designed" out of MCL 750.222(d), we should do likewise. To fail to do so is to ignore the Legislature's choice.

Instead of focusing on the Legislature's choice of words in MCL 380.1311(11)(d), the majority relies in its analysis on the wording of other statutes that define "dangerous weapon." For instance, the home invasion statute, MCL 750.110a(1)(b), provides:

16

"Dangerous weapon" means 1 or more of the following:

(*i*) *A loaded or unloaded firearm, whether operable or inoperable.*

(*ii*) A knife, stabbing instrument, brass knuckles, blackjack, club, or other object specifically designed or customarily carried or possessed for use as a weapon.

(*iii*) An object that is likely to cause death or bodily injury when used as a weapon and that is used as a weapon or carried or possessed for use as a weapon.

(*iv*) An object or device that is used or fashioned in a manner to lead a person to believe the object or device is an object or device described in subparagraphs (*i*) to (*iii*). [Emphasis added; see also MCL 600.606 and MCL 766.14.]

In the home invasion statute, the Legislature obviously wished to classify as dangerous more than just firearms. It wanted to prohibit someone from perpetrating a home invasion using any weapon that could threaten harm to the occupants. Hence, it included both operable firearms and inoperable firearms. Although an inoperable firearm cannot fire a shot, it can be used to threaten and intimidate a person during a home invasion. Therefore, the inclusion of inoperable firearms in MCL 750.110a is wholly consistent with *Hill's* interpretation of MCL 750.222(d) and with the intent *Hill* recognized in criminal statutes involving firearms. *Hill*, 433 Mich 473.

By contrast, the majority's definition of the word "firearm" is inconsistent with MCL 750.110a(1)(b), MCL 600.606(2)(b) and MCL 766.14(4)(b). The majority reads "firearm" to include inoperable firearms. This definition of "firearm" renders the specific inclusion of inoperable firearms in MCL

750.110a(1)(b), MCL 600.606(2)(b) and MCL 766.14(4)(b) unnecessary, repetitive, and nugatory. If the Legislature intended the word "firearm" to include both operable and inoperable firearms, it would not have added the term "inoperable" to these statutes.

The use of "inoperable" in MCL 750.110a demonstrates that the Legislature knew how to write statutes to include inoperable firearms. But, when it wrote MCL 750.222(d), it decided not to do so. Again, the majority ignores that the Legislature made this choice. Rather, it replaces the words of the statute with its own. In so doing, it creates judicially a legislative policy preference, something the majority has repeatedly claimed to abhor.[10]

The majority all but concedes that its interpretation of "firearm" renders part of MCL 750.110a(1)(b) redundant. But it claims that my interpretation would render the statute more redundant. The claim is misleading. Under *Hill*, a firearm is only a firearm if it can propel a qualifying projectile. If the Legislature wished to include inoperable firearms in the statute, it should have said so. In MCL 750.110a(1)(b), the Legislature had that intention, and it specifically included

---

[10] See *Rory v Continental Ins Co*, 473 Mich 457, 470-471; 703 NW2d 23 (2005); *Devillers v Auto Club Ins Ass'n*, 473 Mich 562, 591-592; 702 NW2d 539 (2005); *Henry v Dow Chemical Co*, 473 Mich 63, 88 n 16; 701 NW2d 684 (2005); *Mayor of Lansing v Pub Service Comm*, 470 Mich 154, 161, 164; 680 NW2d 840 (2004); *People v Hawkins*, 468 Mich 488, 500; 668 NW2d 602 (2003); *Terrien v Zwit*, 467 Mich 56, 66-67; 648 NW2d 602 (2002); *People v Sobczak-Obetts*, 463 Mich 687, 694-695; 625 NW2d 764 (2001); *Herald Co v Bay City*, 463 Mich 111, 117; 614 NW2d 873 (2000).

inoperable firearms. Far from making this portion of the statute redundant, my

interpretation gives it meaning.

The majority also contends that the *Hill* definition of "firearm" would not

include an unloaded gun. This is simply not the case. *Hill* stated: "[T]emporarily

inoperable firearms which can be made operable within a reasonable time fall

within the purview of the statutes that govern the use and possession of firearms."

*Hill*, 433 Mich 477. An unloaded firearm can be made operable within a

reasonable time simply by loading it with bullets. Accordingly, an unloaded

firearm falls under both the definition of "firearm" created by the majority in this

case and the definition created by the Legislature and recognized in *Hill*.

Inexplicably, also, the majority contends that the use of the phrase

"designed and manufactured" in the second sentence of MCL 750.222(d)[11]

supports its claims that "may" means "designed" in the first sentence. The fact

that the Legislature used "designed" in the very next sentence after it decided to

use "may" demonstrates that this choice was no accident. It again demonstrates

that, when it enacted MCL 750.222(d), the Legislature knew how to create a

"design" requirement. It did not do so in the first sentence. The majority asks the

---

[11] The second sentence reads: "Firearm does not include a smooth bore rifle or handgun *designed and manufactured* exclusively for propelling by a spring, or by gas or air, BB's not exceeding .177 caliber." MCL 750.222(d) (emphasis added).

19

reader to ignore the difference in these sentences. To read "designed" into the first sentence defies legal precedent, logic, and common sense.

I agree with the majority that MCL 750.222(d) is intended to describe what weapons constitute firearms. The statute distinguishes firearms from other weapons by focusing on their capacity to propel a dangerous projectile. Therefore, the operability of the firearm is what distinguishes it from other weapons. *Hill* recognized this distinction. Without the possibility of propelling a projectile, a gun does not significantly differ as a weapon from a club. The majority's interpretation eliminates the distinction the Legislature sought to create.[12]

The majority attempts to bolster its additions to the language of MCL 750.222(d) by referencing MCL 752.841. MCL 752.841 contains the definition of a "firearm" for the death or injuries from firearms act, MCL 752.841 to MCL 752.845. MCL 752.841 provides: "For the purposes of this act the word 'firearm' shall mean any weapon or device from which *is propelled* any missile, projectile, bullet, shot, pellet or other mass by means of explosives, compressed air or gas or

---

[12] The majority contends that the most reasonable assumption is that the "may" clause is intended to differentiate only between types of weapons. It believes that one should not assume that it is intended to differentiate between types of weapons *and also* to differentiate between inoperable and operable weapons. It offers no legal support or other explanation for its preference. My conclusion is that the majority's reading makes little sense given the context of the clause. It is with respect to the operability of a weapon that the Legislature differentiates among weapons. A firearm is a firearm and not a club only when it has the ability to propel a projectile. In reality, the majority is indicating that it is uncomfortable with the means the Legislature chose to distinguish between types of weapons.

by means of springs, levers or other mechanical device." (Emphasis added.) The majority contends that the Legislature uses the phrase "is propelled" when it wants to include an operability requirement.

This contention is strained. MCL 752.841 uses the "is propelled" language because a gun must actually be fired to fall within the act's definition of "firearm." This is in contrast to the statutes prohibiting felony-firearm, felon in possession, carrying a concealed weapon, and possession of a short-barreled shotgun, which do not require that the weapon actually be operated. Under these crimes, a defendant is equally guilty regardless of whether the firearm is discharged. These are possession crimes. Hence, the Legislature used "may be propelled" in MCL 750.222(d). Had it wanted these crimes to punish the use of a weapon, it would have used the language "is propelled" that it used in MCL 752.841.

Far from supporting the majority's interpretation, the difference between MCL 752.841 and MCL 750.222(d) demonstrates that *Hill* came to the correct conclusion regarding the meaning of "may be propelled." This difference shows how far the majority is reaching to invent the "design" requirement that it relies on. Simply put, the majority has departed from its claimed textualist "philosophy" and added to the language of the statute something that is not there.

THE RULE OF LENITY

The majority claims that its interpretation is the correct reading of MCL 750.222(d). This is despite the fact that *Hill* reached a different conclusion when confronted with the same "may be propelled" language. And it is despite the fact

21

that the majority recognizes a long split of authority on this subject in the Court of Appeals. The majority admits that several Court of Appeals cases have found an inoperability defense to carrying a concealed weapon. In addition, it concedes that there is more than one plausible meaning to the statute. In ignoring the legal authority to the contrary, the language of the statute, and the other plausible meanings of the language, the majority violates the rule of lenity.

Courts have long held that any ambiguity regarding the scope of criminal statutes must be resolved in favor of lenity. *Huddleston v United States*, 415 US 814, 830-831, 94 S Ct 1262; 39 L Ed 2d 782 (1974), quoting *Rewis v United States*, 401 US 808, 812; 91 S Ct 1056; 28 L Ed 2d 493 (1971). That is, if a criminal statute is open to more than one legitimate interpretation, it should be construed strictly. This means that the statute should be construed in favor of the defendant. *United States v Wiltberger*, 18 US (5 Wheat) 76, 95; 5 L Ed 37 (1820). The rule of lenity is important in criminal cases because it provides constitutional fair warning. It does this by making clear what the law intends to do if someone crosses a certain line and where that line is drawn. *United States v Lanier*, 520 US 259, 265; 117 S Ct 1219; 137 L Ed 2d 432 (1997).

I do not believe that the majority has put forth a legitimate interpretation of MCL 750.222(d). But even if it had, I would reach the conclusion that

22

inoperability is a defense to felon in possession and felony-firearm.[13] This is because then the rule of lenity would require us to construe MCL 750.222(d) in favor of defendant. The rule favors the result reached in *Hill*. Therefore, if one could read MCL 750.222(d) to offer an inoperability defense or not to offer it, the constitution requires that the Court chose the former. *Wiltberger*, 18 US (5 Wheat) 95. The majority ignores the rule of lenity and does not interpret the statute consistently with its actual language. This is constitutionally impermissible.

The majority concedes in its opinion that it finds two possible ways to read the statute.[14] It states: "[B]oth of these meanings are plausible given the use of "may" in the statute." *Ante* at 6. Because the majority recognizes that it is choosing between two reasonable interpretations of the statute, it must realize that

---

[13] The majority accuses me of resorting to the rule of lenity without finding an ambiguity. It misses my point. My discussion of the rule of lenity is premised on an alternative argument. If the majority had put forth a legitimate interpretation of MCL 750.222(d), the statute would be ambiguous. This is because the language would be susceptible to more than one interpretation and reasonable minds could differ with respect to its meaning. *In re MCI Telecom Complaint*, 460 Mich 396, 411; 596 NW 2d 164 (1999). In such a situation, the rule of lenity would apply. And it would require the statute to be interpreted favoring defendant. *Wiltberger*, 18 US (5 Wheat) 95. Of the two interpretations presented, the one put forth in *Hill* favors defendant. Therefore, the rule of lenity requires that we apply the *Hill* interpretation. Significantly, that interpretation is the one that actually matches the language chosen by the Legislature.

[14] I reiterate that I do not believe that there are two legitimate interpretations of MCL 750.222(d). This is because the majority's proposed interpretation creating a "design" requirement is not supported by the language of the statute.

the Constitution requires it to follow the rule of lenity. *Wiltberger*, 18 US (5 Wheat) 95. But it does not do so. Rather than choose the interpretation that favors defendant, it chose the one that disfavors him. This not only further demonstrates that the majority's interpretation is legally incorrect, it renders the opinion constitutionally suspect. The majority ignores both the words of the statute and the constitutional requirements placed on it in interpreting those words.

The majority states that it "believe[s] that the words of the statute as a whole indicate an intent to include a broad definition . . . ." *Ante* at 6 n 2. But this is a policy choice. The statement that a broader rather than a narrower interpretation of the statute was intended violates the rule of lenity, as articulated by the United States Supreme Court.

> [W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite. We should not derive criminal outlawry from some ambiguous implication. [*United States v Universal CIT Credit Corp*, 344 US 218, 221-222; 73 S Ct 227; 97 L Ed 260 (1952).]

In this case, there is not even an "ambiguous implication" on which the majority can rest its decision. As such, the choice it makes between the two plausible meanings it recognizes does not survive the constitutional protections afforded by the rule of lenity.

The rules of lenity and fair warning are especially important in this case in light of *Hill*. *Hill* offered the only interpretation from this Court of the language "may be propelled." It should have influenced defendant's understanding of what

constitutes a firearm. Arguably, *Hill* set the line that divides innocent behavior from criminal behavior. In this case, defendant could not have known that holding a piece of scrap metal would subject him to prosecution for felon in possession and felony-firearm. For that reason, defendant's constitutional right to fair warning was violated. *Lanier*, 520 US 265.[15]

Because the rules of lenity and fair warning favor an inoperability defense, such a defense is constitutionally required. Accordingly, this case should be remanded for a new trial. At trial, the court should allow defendant to argue to the jury that the weapon was not operable and could not reasonably and readily be repaired within a reasonable time. Any other outcome raises serious constitutional concerns.

---

[15] The majority finds it incredible that I refer to *Hill* in this section of my argument. It is true that *Hill* did not purport to interpret the felony-firearm statute. But it is also true that *Hill* is precedent from this Court interpreting the exact language we discussed in this case. On the same date it issued this opinion, the majority stated that "absolutely identical phrases in our statutes" should have identical meanings. *Paige*, 476 Mich ___, slip op at 25. It made this statement repeatedly and emphatically. For example, it wrote in *Paige*:

> When identical words in the law, lying within a similar statutory context, mean something altogether different, we do believe that there is a "practical workability" problem, not in the sense that a court of law cannot render some decision—no opinion of this Court is "unworkable" in that sense—but in the sense that the law is made a mockery, meaning one thing in one paragraph and something else in the next. [*Id*., slip op at 14-15.]

It is unclear to me why the majority felt so strongly about this point in *Paige* but not in this case.

CONCLUSION

Contrary to the majority's contention, this Court's decision in *Hill* provides significant guidance on how to properly interpret MCL 750.222(d). *Hill* dealt with a nearly identical statute and, in fact, construed the identical phrase "may be propelled" that this case scrutinizes. The majority's decision to ignore *Hill's* guiding precedent is seriously erroneous.

Ignoring *Hill*, the majority creates a new "design" requirement for MCL 750.222(d). It is unsupported by the text of the statute. And it reads into the statute something that previously was not there and was not intended by the Legislature.[16] The majority's decision to change the words of the statute violates both the rule of lenity and the constitutional requirement of fair warning.

---

[16] The members of the majority accuse me of falling into the trap of the false choice fallacy by concluding that they are paying mere lip service to their claimed philosophy. "The logical fallacy of false choice is a correlative-based fallacy in which options are presented as being exclusive when they may not be. It is often used to obscure the likelihood of one option or to reframe an argument on the user's terms." False Choice, Wikipedia <http://en.wikipedia.org/wiki/False_choice> (accessed July 7, 2006).

It is not I who commits this fallacy here. I do not argue simply that the majority errs because it disagrees with my interpretation. I argue that the majority is not true to its "plain language" philosophy; it ignores the words of the statute and adds a "design" requirement that the Legislature chose not to add. Ironically, it is the majority that commits the fallacy of the false choice. It argues that one must agree with its reading of the statute or commit a logical fallacy. Perhaps it does this only "to reframe an argument on the user's terms." *Id*. This seems the true "argumentative sleight of hand." *Ante* at 20.

26

Defendant was entitled to an inoperability defense. The trial court's instructions denied him that defense, and they failed to properly inform the jury of the central issue in the case. This amounted to plain error requiring reversal. Therefore, I would remand the case for a new trial.

Marilyn Kelly

Cavanagh, J. I concur only in the result proposed by Justice Kelly.

Michael F. Cavanagh